[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-10775

_____

D. C. Docket No. 05-00324-CR-8-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JORGE FLORES,
a.k.a. Alfonso Medina Hernandez,
a.k.a. Juan Diaz-Jasso,
a.k.a. Shadow,
ARMANDO PRUDENTE,
a.k.a. Armando Balaco,
a.k.a. Charra,
ROBERTO SANDOVAL,
a.k.a. Charrita,
RICARDO GAMA,
a.k.a. Kiwi,
ISRAEL CRUZ,
a.k.a. Najeiza Cruz,
a.k.a. Mananitas,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Georgia
_____
(June 29, 2009)

Before WILSON, KRAVITCH and ANDERSON, Circuit Judges.

PER CURIAM:

This is a criminal appeal from the convictions and sentences of five members of the Hispanic street gang "Sureños-13" ("Sur-13"). Armando Prudente, Roberto Sandoval, Israel Cruz, Jorge Flores, and Ricardo Gama (collectively "the defendants") were charged with thirteen others in a 31-count indictment for crimes involving, inter alia, conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., two murders, possession of firearms, and possession of drugs with intent to distribute. The five defendants were tried together and were convicted of various counts of the indictment. They now appeal several aspects of their convictions and sentences.

On appeal, the defendants raise the following arguments: (1) the district court abused its discretion by dismissing for cause a juror who suffered from untreated attention deficit disorder; (2) the defendants were deprived of the presumption of innocence when one potential juror, in the presence of the venire, commented that during his employment as a corrections officer, he had "dealt"

2

with one or more of the defendants; (3) the evidence was insufficient to establish that Flores was an accomplice in the murder of Rogelio Guzman; (4) the court impermissibly admitted a codefendant's hearsay statements that were not made in furtherance of the conspiracy; (5) the district court abused its discretion by not requiring the government to disclose the identity of a confidential informant; (6) the district court abused its discretion by not instructing the jury on the defense of justification; (7) the district court erred by instructing the jury that drug distribution, by law, satisfies the interstate nexus element of a RICO conspiracy charge; (8) Prudente's sentence is unconstitutionally cruel and unusual, in violation of the Eighth Amendment; (9) Sandoval's sentence, because it was enhanced for a crime of "juvenile delinquency," exceeds the statutory maximum; and (10) Sandoval's sentence is unreasonable.

## I. Facts and Background

The defendants' trial lasted four weeks and included testimony by Sur-13 members and law enforcement officers, along with evidence obtained from wiretaps and surveillance videos. The evidence adduced at trial established the following:[1]

---

[1] This recitation of the facts does not include evidence related to the drug crimes because such evidence is not relevant to this appeal. Instead, we focus principally on the facts surrounding the two murders.

3

Sur-13 is a gang with chapters in several U.S. cities, including Atlanta. The gang is hierarchical, with a three-tiered structure that groups members based on age and status. When Sur-13 initiates a new member, the individual is "jumped in" through a beating by three other gang members. A member can then improve his status within Sur-13 by "putting in work" for the gang through, among other things, participating in drive-by shootings, robberies, burglaries, and violent confrontations with members of rival gangs.

In 1996, Prudente was the second ranking member in Sur-13's Atlanta chapter, behind the chapter's founder, "Chico." When Chico was not present, Prudente acted as the gang's leader.[2] In his role as leader, Prudente had discretion to order attacks on rival gangs and to impose beatings on fellow Sur-13 members for violations of the gang's rules.

On April 24, 1999, Sergio Escutia, a Sur-13 member, was standing in a parking lot outside of an apartment complex as he spoke on his cell phone with Prudente. Escutia was approached by members of "La Gran Familia," a coalition of gangs that includes Sur 13's rivals, the "Brown Side Locos." The rival gang members, apparently seeking a violent confrontation, made gang signs with their hands and exposed weapons, but Escutia did not "throw back" his gang sign

---

[2] For reasons not fully explained at trial, "[a]t some point Chico wasn't really around" and Prudente became the chapter's permanent leader.

because children were present.  Escutia left the scene and, at Prudente's direction, came to Prudente's Atlanta apartment.

At Prudente's apartment, Escutia told Prudente and some other Sur-13 members about the confrontation with La Gran Familia.  Prudente left the room and returned with two TEC-9 semi-automatic firearms, saying he was angry with the Brown Side Locos for a drive-by shooting that they allegedly conducted the day before, which resulted in damage to two of Prudente's cars.  Prudente assembled a group for a "payback" mission, comprised of Flores, Sandoval, Escutia, and an individual nicknamed "Smiley."  Prudente handed the TEC-9 firearms to Flores and Sandoval.

The group loaded into Escutia's red Mustang, with Escutia in the driver's seat, Flores in the front passenger's seat, and Sandoval and Smiley in the rear passengers' seats.  The guns were placed underneath the backseat and Sandoval directed Escutia to Gwinnett County, which was considered the Brown Side Locos' turf.  Once there, Sandoval directed Escutia to follow a brown Impala.  The Impala pulled into a store parking lot and the occupants spoke with the occupants of a nearby white Monte Carlo.  The Sur-13 members believed the two cars contained members of the Brown Side Locos because the cars "fit the type of cars that we usually would look for like with spoked rims, low rider style . . . ."  After about

5

fifteen minutes, the Impala pulled out of the parking lot, followed by the Monte Carlo. Sandoval ordered Escutia to follow the Monte Carlo and a gun was passed to Flores from one of the occupants of the backseat. Escutia, again at Sandoval's direction, pulled up next to the Monte Carlo and Flores leaned out of the window and fired at the Monte Carlo, killing the driver of the vehicle, Rogelio Guzman. After two shots, Flores's gun jammed and Escutia drove off.

The group returned to Prudente's apartment, where Flores and Sandoval bragged about the night's events. Prudente collected the firearms and instructed those present not to discuss the shooting with anyone else. Another gang member heard Prudente on the telephone a day or two later trying to sell two TEC-9 firearms.

Prudente ordered Escutia to dispose of the car used in the Guzman killing; approximately one week after the shooting, Escutia drove his car to Calhoun, Georgia and left it with a friend. Two or three weeks later, Escutia's mother told him that the police were looking for him and that they were asking questions about his car and a shooting. Escutia relayed this information to Prudente. In order to protect his nephew, Sandoval, from going to jail, Prudente ordered Escutia to frame two Sur-13 members, known as "Sleepy" and "Dundee," for the Guzman killing. Escutia thereafter told police that the passengers in the car on the night of

6

the killing were Flores, Sleepy, and Dundee. The car was recovered by police and Sleepy and Dundee later pleaded guilty to the April 24th shooting.

The jury also heard testimony about a second Sur-13 killing. On the night of December 12, 2003, some Sur-13 members, including Cruz, attended a party in a clubhouse open to the public. The party's organizers hired two security guards to monitor the venue's door. Sometime after midnight, members of the rival gang "Vatos Locos" arrived at the party. Inside the clubhouse, members of the two gangs argued and a fight broke out, which included members of the gangs throwing beer bottles at each other. The security guards "shut the whole party down" and "ushered everybody out" the clubhouse's front door. Once outside, Cruz and others stood on the steps of the building, arguing with party-goers on the ground below and threatening to shoot them. Cruz pulled a pistol out of his jacket pocket and fired it towards the crowd. He fatally shot Florentine Marcial, who was not a gang member, in the back.

The jury convicted the defendants of many, but not all, of the charges in the superceding indictment. The jury's findings most relevant to this appeal are the following: The jury found Prudente and Flores guilty of the Guzman murder and Cruz guilty of the Marcial murder, both violent crimes in aid of racketeering. See 18 U.S.C. § 1959(a)(1). The jury issued special findings as to the RICO

7

conspiracy charges, finding that Prudente and Sandoval both committed the Guzman murder, an overt act in furtherance of a pattern of racketeering activity. See 18 U.S.C. §§ 1961(1), (5), 1962(c), (d). The district court sentenced Prudente, Flores, and Cruz to life plus 120 months' imprisonment, Sandoval to life imprisonment, and Gama to 51 months' imprisonment. All five defendants appealed.

## II. Discussion

After reviewing each of the defendants' arguments on appeal and finding no error, we affirm their convictions and sentences.

*A. Juror Dismissal*

At voir dire, Ms. Fisher, a potential juror, informed the court that she suffered from attention deficit disorder ("ADD") and was not on medication because she did not presently have insurance. She explained that this untreated condition could "cause [her] mind to wander." The district court initially responded, "Okay. Well if you get selected and you have a problem, let me know. I didn't mean to embarrass you." Despite the defendants' objections, however, the district court subsequently excused Fisher for cause, citing "her health problems and her [lack of] medication."

A trial court is granted discretion in conducting its voir dire examination and

8

determining whether to excuse a juror for cause. United States v. Schlei, 122 F.3d 944, 994 (11th Cir. 1997); United States v. Annigoni, 96 F.3d 1132, 1139 (9th Cir. 1996) (en banc). An individual may be incapable, by reason of mental or physical infirmity, to render satisfactory jury service. See 28 U.S.C. § 1865(b)(4). A trial court may excuse a potential juror for cause due to health issues. See United States v. Campa, 459 F.3d 1121, 1135 (11th Cir. 2006) (en banc); see also United States v. Candelaria-Silva, 166 F.3d 19, 30 (1st Cir. 1999) (finding no abuse of discretion in dismissing two jurors for medical reasons even though one did not state that his medical condition would interfere with his service as a juror and the other appeared to be dismissed in part because he held a law degree).

The defendants argue that the district court abused its discretion by dismissing Fisher for cause. The defendants concede that ADD is a medical condition and that it could be a basis for excluding a juror, but question the wisdom of the district court's decision here. They contend that the district court was required to inquire further into Fisher's medical condition to determine the severity of her ADD. We disagree. The trial lasted four weeks, involved multiple different crimes and defendants, and contained a significant amount of witnesses and exhibits. Because untreated ADD could interfere with a juror's ability to pay attention, particularly in such a lengthy trial, the district court acted within its

sound discretion when it dismissed Fisher for cause.

## B. *Alleged Deprivation of the Presumption of Innocence*

During voir dire, the district court confirmed that Mr. Holley, a potential juror, was a corrections officer for the city of Atlanta and asked him, "have you dealt with any of the people on trial here?" Holley indicated that he had and responded "yes" when the court asked if he "would have a lot of difficulty being a fair and impartial juror." The district court immediately excused Holley for cause. Defense counsel moved for a mistrial on the grounds that Holley's statements deprived the defendants of their presumption of innocence because such statements alerted the rest of the venire that the defendants "are all incarcerated or have been at some time or another."

We review the district court's determination whether to strike an entire jury panel for manifest abuse of discretion. United States v. Trujillo, 146 F.3d 838, 842 (11th Cir. 1998). "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." Estelle v. Williams, 425 U.S. 501, 503 (1976). The Supreme Court has held that it is impermissible for a court to compel an accused to stand trial in identifiable prison clothes because it creates a "constant reminder of the accused's condition . . . [that] may affect a juror's judgment." Id. at 504-05. "While use of

10

such words as 'jail,' 'prison,' [and] 'arrest' are, generally to be avoided, where irrelevant, the mere utterance of the word does not, without regard to context or circumstances, constitute reversible error per se." United States v. Veteto, 701 F.2d 136, 139-140 (11th Cir. 1983) (quoting United States v. Barcenas, 498 F.2d 1110, 1113 (5th Cir. 1974)).  Instead, the presumption of innocence is only impaired in cases where some statement or action yields the danger of "a continuing influence throughout the trial . . . ." Estelle, 425 U.S. at 505.

In United States v. Villabona-Garnica, 63 F.3d 1051 (11th Cir. 1995), this court held that a witness's brief reference to the accused's incarceration, when viewed in context, was "unlikely to prejudice the jury sufficiently to rise to the level of a due process violation." Id. at 1058.  Similarly, in the instant case, Holley's statements were not of sufficient magnitude to constitute a deprivation of the presumption of innocence.  Holley's statements were short and nondescript. He did not say which defendants he met during the course of his employment or the circumstances surrounding their confinement.  Moreover, evidence was introduced by the government, without objection from the defendants, detailing the defendants' arrests in connection with the instant case.  There is no evidence that Holley's statements prejudiced the venire and created the danger of "a continuing influence throughout the trial." Estelle, 425 U.S. at 505.  The district court

11

therefore did not abuse its discretion by declining to strike the entire jury panel.

*C. Sufficiency of the Evidence that Flores Committed the Guzman Murder*

Flores argues that the evidence was insufficient to prove that he murdered Guzman. He contends that the government did not present any physical evidence linking him to the Guzman murder and that most of the testimony against him came from Sur-13 members who were inconsistent, lacked credibility, and were hoping to curry favor with the prosecution. Flores contends that the evidence against him was particularly insubstantial in light of the fact that two other gang members had already pleaded guilty to this murder.

We review challenges to sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in the government's favor. United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008). "[T]he question is whether reasonable minds could have found guilt beyond a reasonable doubt, not whether reasonable minds must have found guilt beyond a reasonable doubt." United States v. Ellisor, 522 F.3d 1255, 1271 (11th Cir. 2008) (emphasis in original). The jury is free to draw between reasonable interpretations of the evidence presented at trial. United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007). Credibility determinations are left to the jury and the jury's verdict will not be disturbed on

appeal unless the testimony is "incredible as a matter of law." United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997) (quotation omitted). Testimony is only "incredible" if it relates to "facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature." Id. (quoting United States v. Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985) (editing marks omitted)).

In the instant case, ample evidence was presented at trial regarding Flores's involvement in the Guzman shooting. Although witnesses' testimonies differed as to whether there were one or two TEC-9 firearms and to whom Prudente handed the guns, every witness who testified about the events at Prudente's apartment on April 24, 1999 placed Flores in the car that left for the "payback" mission against the Brown Side Locos. Those at Prudente's apartment after the shooting heard Flores bragging about shooting a Brown Side Loco. Escutia, the driver of the automobile, testified that Flores was the shooter. Escutia admitted that he previously lied to law enforcement and that two innocent Sur-13 members went to jail for the Guzman killing, but explained that he did so at the direction of Prudente. This evidence is sufficient to support Flores's conviction for the murder. Additionally, although many of the witnesses were criminals and gang members, testimony is not "incredible" solely because it is proffered by "an array of

13

scoundrels, liars and brigands." United States v. Hewitt, 663 F.2d 1381, 1385 (11th Cir. 1981). The witnesses' criminal pasts and prior inconsistent statements were made known to the jury, and the jury was entitled to weigh their testimonies accordingly.

## D. Hearsay Statements by a Codefendant

Isaac Alamia testified that around 1999, shortly after he joined Sur-13, he was told by fellow gang members that Sandoval was "leaving." Alamia did not see Sandoval again until 2004, at which time Sandoval told him that he had been in Acapulco, Mexico because he was "on the run for murder." Alamia testified that Sandoval told him details of a murder, including that Sandoval and Flores were in Escutia's car, that they followed another car containing rival gang members, and that Flores "got out with like a gun, and he started shooting, and the gun had got jammed, and that's the only reason he didn't let go of all of the bullets." Alamia testified that Sandoval told him Flores shot the rival gang member to "up the neighborhood, to put up the gang, to gain respect." The district court admitted these statements as statements of a co-conspirator made in furtherance of the conspiracy. See FED. R. EVID. 801(d)(2)(E).

Flores argues Alamia should not have been permitted to testify about Sandoval's hearsay statements because the statements were not made in

14

furtherance of the conspiracy. Two Sur-13 members testified that Prudente told the gang members not to talk about the Guzman murder. Flores therefore argues that any statements made by Sandoval could not have been in furtherance of the conspiracy because they were counterproductive to the gang's purpose and in violation of the gang leader's direct order.

We review a district court's evidentiary rulings for an abuse of discretion and may overturn findings of fact only if clearly erroneous. United States v. Magluta, 418 F.3d 1166, 1177 (11th Cir. 2005). Hearsay is inadmissible unless it meets one of the exceptions to the hearsay rule. See FED. R. EVID. 802. Under Rule 801(d)(2)(E), statements made by a co-conspirator in furtherance of a conspiracy are not hearsay. FED. R. EVID. 801(d)(2)(E). For a statement to constitute non-hearsay by a co-conspirator, the government must show by a preponderance of the evidence that:

> (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement was made during the course and in furtherance of the conspiracy. In determining the admissibility of co-conspirator statements, the trial court may consider both the co-conspirator's statements and independent external evidence.

United States v. Hasner, 340 F.3d 1261, 1274 (11th Cir. 2003). Flores only challenges the third prong, arguing that the statement was not made in furtherance of the conspiracy.

15

Whether a statement is made in furtherance of the conspiracy is a finding of fact which may be overturned only if clearly erroneous. United States v. Posner, 764 F.2d 1535, 1537 (11th Cir. 1985). This court applies "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002) (quoting United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988)). "The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way." Id.

Both Alamia and the witness who testified before him, Rodolfo Perez, stated that Sur-13 members who shot rival gang members were entitled to respect and high status in the gang. Because Sandoval's statements to Alamia served to inform Alamia about Flores's reliability and stature, and thus foster cohesiveness within the gang, these statements furthered the interests of the conspiracy. Thus, the district court did not abuse its discretion by admitting Alamia's testimony.

*E. Identity of a Confidential Informant*

At trial, Juan Pedro Morales Rumualdo ("Morales"), a Sur-13 member, testified for the government. He explained that upon being arrested on immigration charges in 2003, he became an informant for the government. As part of his cooperation with the government, he wore recording devices when

16

purchasing controlled substances and firearms. On cross-examination, defense counsel challenged Morales's credibility by asking if he ever purchased drugs when he was not monitored by the government or if he kept some of the purchased drugs for his own use. Morales indicated that he had not.

Immigration and Customs Enforcement Special Agent Steven Ledgerwood, the officer who directed Morales to make the controlled purchases of drugs and firearms, later testified. On direct examination, Ledgerwood was asked how he knew that Morales did not buy drugs for personal use when not wearing a recording device. Ledgerwood responded, "[I] had another informant within the gang that would also provide me intelligence at the same time." Gama's counsel objected to this statement on the ground that the government had not disclosed the identity of this other informant. The district court conducted an in camera review of an unredacted copy of government documents and concluded that the materials showed no direct criminal participation by the unidentified informant, that the informant's probable testimony would not aid in establishing a defense against the charges in the instant case, and that the government had a legitimate interest in nondisclosure. The district court thus ruled that the government was not required to disclose the informant's identity. The next morning the district court instructed the jury to disregard the testimony about the unidentified confidential informant.

17

Gama argues that Ledgerwood's testimony about the unidentified informant constituted impermissible "bolstering" of Morales's testimony. Gama contends that the government should have been ordered to disclose the identity of this informant so that the defense could impeach this informant's credibility.

We review a district court's ruling that the government need not disclose the identity of a confidential informant for abuse of discretion. United States v. Gutierrez, 931 F.2d 1482, 1490 (11th Cir. 1991). The government's privilege to withhold the identity of a confidential informant is limited. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." Roviaro v. United States, 353 U.S. 53, 60-61 (1957). The Supreme Court requires balancing competing interests, id. at 62, and this court has found that this inquiry principally involves consideration of three factors: (1) "the extent of the informant's participation in the criminal activity"; (2) "the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant"; and (3) "the government's interest in nondisclosure." United States v. Tenorio-Angel, 756 F.2d 1505, 1509 (11th Cir. 1985). "The government's interest may be proven by showing that disclosure might endanger the informant or other investigations." Id.

18

The district court identified the appropriate test and concluded that the confidential informant did not participate in any of the criminal activities listed in the indictment. Although the burden was on Gama to establish the relationship between his asserted defense and the probable testimony of the informant, see Gutierrez, 931 F.2d at 1491, he failed to do so. Finally, the government proffered legitimate interests in nondisclosure, including the informant's safety and the informant's involvement in other ongoing investigations. The district court therefore did not abuse its discretion by declining to order the government to disclose the confidential informant's identity.

*F. Justification Instruction*

Cruz requested a jury instruction on justifiable homicide for the Marcial murder. He submitted a proposed jury instruction, stating, "[u]nder certain circumstances a homicide can be justified. The applicable standard is whether the circumstances would excite the fears of a reasonable man to the point that he would feel it necessary to use deadly force to prevent death or great bodily injury." The district court declined to instruct the jury on justification.

On appeal, Cruz argues that the district court erred by not charging the jury on justification or giving related instructions.[3] He contends that his theory at trial

---

[3] Cruz's brief argues that the district court should have also charged the jury on "fears of a hypothetical reasonable man," "transferred justification," "no duty to retreat," and

19

was that because he was surrounded by rival gang members that wished to do him harm, "he acted reasonably under the circumstances" by firing his weapon and that "any reasonable man would have acted the same way."

We review a district court's refusal to give a proposed jury charge for abuse of discretion. United States v. Yeager, 331 F.3d 1216, 1222 (11th Cir. 2003). "The justification defense serves only as a legal excuse for the criminal act and is based on additional facts and circumstances that are distinct from the conduct constituting the underlying offense." United States v. Deleveaux, 205 F.3d 1292, 1298 (11th Cir. 2000). Because it is an affirmative defense, the burden is on the defendant to prove justification by a preponderance of the evidence. Id. at 1299. Justification requires that the defendant prove "[1] that he acted under an immediate threat of death or serious bodily injury, [2] that he had a well-grounded fear that the threat would be carried out, and [3] that he had no reasonable opportunity to escape or inform [the] police." United States v. Wattleton, 296 F.3d 1184, 1196 n.20 (11th Cir. 2002) (quoting United States v. Alzate, 47 F.3d 1103, 1104 (11th Cir. 1995)). This court has explained that "[t]he first prong requires

---

"justification even without an assault." Cruz, however, does not cite any authority supporting these charges or identify any facts supporting these proposed defenses. These arguments are therefore waived. See Flanigan's Enters. v. Fulton County, Ga., 242 F.3d 976, 987 n.16 (11th Cir. 2001) (A bare allegation will waive an issue on appeal if the party "fail[s] to elaborate or provide any citation of authority in support of the . . . allegation.").

nothing less than an immediate emergency." United States v. Rice, 214 F.3d 1295, 1297 (11th Cir. 2000).[4]

In the present case, Cruz did not establish the elements of the justification defense. Cruz was not under an imminent threat of death or serious bodily injury at the time he fired his weapon. The security guard testified that a fight broke out inside the party and that bottles were thrown, but that he and his partner then closed the party and "ushered everybody out" of the clubhouse. A witness testified that once outside, Cruz stood with a group at the top of the steps, taunting those below and threatening to shoot them. There is no evidence that Cruz was being attacked at the time he fired his gun or that anyone else at the party had a weapon. A forensic pathologist from the Fulton County Medical Examiner's Office testified that the bullet entered Marcial's torso at a slightly upward trajectory, consistent with the theory that Marcial was crouching or running away at the time he was shot.

Cruz did not meet his burden of proving an entitlement to a justification charge and thus the district court did not abuse its discretion by declining to give

_____

[4] We cite to both justification and duress jurisprudence because the defenses are overlapping concepts with the same analysis. See Boyde v. California, 494 U.S. 370, 399 n.5 (1990) ("[T]he doctrine of justification and excuse in our criminal law focuses solely on factors related to the commission of the crime, such as duress, necessity, entrapment, and ignorance or mistake."); see also Deleveaux, 205 F.3d at 1297 (explaining the Supreme Court's holding in another case as "recognizing that the justification defenses of duress and necessity . . .").

21

Cruz's proposed charge.

## G. Interstate Nexus Charge

The district court instructed the jury that in order to convict Prudente, Sandoval, and Gama of RICO conspiracy, the defendants must have been "associated with an enterprise that was engaged in or the activities of which affected interstate commerce." In explaining interstate commerce, the district court instructed,

> distribution of an illegal drug by law affects interstate commerce, therefore you may find that the requisite effect on interstate commerce has been proven if you find beyond a reasonable doubt that the enterprise described in the Indictment was engaged in drug distribution, even if that distribution occurred wholly within the state of Georgia.

On appeal, Prudente argues that the district court erred in giving this instruction because it removed the government's burden to prove all of the essential elements of the offense charged beyond a reasonable doubt, in violation of Prudente's Fifth and Sixth Amendment rights.[5] Prudente acknowledges that this argument may have been rejected by this court in United States v. Bernard, 47 F.3d 1101 (11th Cir. 1995), where this court held, in light of congressional findings in the Controlled Substances Act ("CSA"), 21 U.S.C. § 801, that "possession and sale

---

[5] Flores filed a motion with this court to adopt Prudente's argument on appeal, but Flores was not named in the RICO conspiracy charge or any count charging drug violations.

of illegal drugs impacts upon interstate commerce."[6]  47 F.3d at 1103.  Prudente, however, argues that Bernard has been abrogated by the Supreme Court's subsequent rulings in Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny.[7]

We review de novo allegations that the district court's jury instructions misstate the law.  United States v. Grigsby, 111 F.3d 806, 814 (11th Cir. 1997).

One of the elements of a RICO conspiracy is that the defendant agreed to participate in the affairs of an enterprise affecting interstate commerce.  United States v. Caporale, 806 F.2d 1487, 1517 (11th Cir. 1986).  This court has concluded that in the context of a RICO conspiracy, "only a slight effect on interstate commerce is required."  United States v. Beasley, 72 F.3d 1518, 1526 (11th Cir. 1996).  In Bernard, a 1995 Hobbs Act case, this court held that in light of the findings in the CSA, "possession and sale of illegal drugs impacts upon interstate commerce" by definition.  47 F.3d at 1103.  Bernard has never been overruled by this court.

---

[6] In the instant case, it is evident from the district court's exchange with the government during the charge conference that the district court used the CSA as the basis for its conclusion that "distribution of an illegal drug by law affects interstate commerce."

[7] In the alternative, Prudente asks this court to "reconsider its position [in Bernard]," however, this court is bound by the decision of a prior panel unless the decision is overruled by the Supreme Court or this court sitting en banc.  United States v. Vega-Castillo, 540 F.3d 1235, 1236 (11th Cir. 2008).

23

A recent Second Circuit ruling in the Hobbs Act case of United States v. Parkes, 497 F.3d 220 (2d Cir. 2007), demonstrates that the rule enunciated by this court in Bernard has been called into question by certain Supreme Court decisions. In Parkes, the Second Circuit held that it is improper to charge a jury that drug distribution, by law, satisfies the interstate element of a crime. Id. at 229. The Second Circuit noted that it had previously deemed such a charge to be proper, see United States v. Fabian, 312 F.3d 550 (2d Cir. 2002), but that rule had been abrogated by subsequent Supreme Court cases like United States v. Booker, 543 U.S. 220 (2005), which "sharpened our focus on the separate consideration of each element that composes an offense" and emphasized the government's duty to prove every element of a crime beyond a reasonable doubt. Parkes, 497 F.3d at 229. It therefore concluded that congressional findings could no longer be used to dispense with the government's burden to prove every element of a crime.[8] Id.

For the purposes of the instant case, we need not decide whether Bernard has been abrogated because, in any event, any alleged error was harmless.[9] Numerous

---

[8] Parkes distinguished Gonzalez v. Raich, 545 U.S. 1 (2005), in which the Court held that the CSA's findings were sufficient to give Congress jurisdiction to regulate intrastate drug cultivation and possession, noting that the CSA does not include an affect on interstate commerce as an element of the offense. Parkes, 497 F.3d at 229.

[9] A district court's jury instructions are subject to harmless error analysis, even where the court incorrectly instructs the jury that an element of a crime had been satisfied as a matter of law. United States v. Drury, 396 F.3d 1303, 1314 (11th Cir. 2005).

pieces of evidence tied Sur-13 and its crimes to interstate commerce. Sur-13 is a national gang, an expert witness testified that two guns at issue in this case were manufactured in Florida and transported to Georgia, and numerous Sur-13 members, with the help of other gang members, fled to other states and countries in order to avoid being arrested for their gang-related crimes. As such, any alleged error in the interstate nexus charge was harmless.

*H. Eighth Amendment Challenge to Prudente's Sentence*

Prudente was convicted under Count 1 for RICO conspiracy, for which the jury issued a special finding that Prudente committed the Guzman murder, and under Count 2 for the murder of Guzman, a violent crime in aid of racketeering ("VICAR murder"). The district court imposed a sentence of life imprisonment for these crimes. Prudente argues that this sentence is cruel and unusual, in violation of the Eighth Amendment, because he merely "aided and abetted" the drive-by shooting, but did not "order" the killing.

We review Prudente's constitutional challenge to his sentence de novo. See United States v. Lyons, 403 F.3d 1248, 1250 (11th Cir. 2005). A sentence only violates the Eighth Amendment if it "is grossly disproportionate to the offense." United States v. Brant, 62 F.3d 367, 368 (11th Cir. 1995). "The Supreme Court has made it clear that '[o]utside the context of capital punishment, successful

25

challenges to the proportionality of sentences [are] exceedingly rare.'" United States v. Raad, 406 F.3d 1322, 1323 (11th Cir. 2005) (emphasis omitted) (quoting Solem v. Helm, 463 U.S. 277, 289-90 (1983)). "In non-capital cases, the Eighth Amendment encompasses, at most, only a narrow proportionality principle." Brant, 62 F.3d at 368. Generally, when a sentence is within the limits imposed by statute, it is neither excessive nor cruel. United States v. Moriarty, 429 F.3d 1012, 1024 (11th Cir. 2005).

In this case, there is no evidence that the sentence is disproportionate to the offense committed. Life sentences are expressly permitted for RICO conspiracy and are required for VICAR murder. 18 U.S.C. §§ 1959(a)(1), 1963(a). Prudente was convicted of both charges and, for the RICO charge, the jury issued a special verdict finding that he murdered Guzman. Although Prudente did not accompany the shooters, he organized the attack, provided the guns, collected the guns after the offense, and ordered the gang members not to discuss the shooting. Because Prudente cannot establish disproportionality, his sentences do not violate the Eighth Amendment.

*I. Juvenile Delinquency Act*

In addition to the RICO conspiracy and drug charges, Sandoval was initially charged with the VICAR murder of Guzman, conspiracy to commit the VICAR

26

murder, and use of a firearm during the VICAR murder. The district court dismissed these latter charges for lack of jurisdiction because Sandoval was 16 years old at the time of the alleged murder and the government failed to get Department of Justice Approval to prosecute him for these crimes, as required by the Juvenile Delinquency Act ("JDA"), 18 U.S.C. § 5031, et seq. The jury convicted Sandoval of the RICO conspiracy and drug charges and returned a special verdict on the RICO count, indicating that Sandoval committed the Guzman murder. The district court sentenced Sandoval to life imprisonment for the RICO conspiracy conviction.

On appeal, Sandoval argues that the sentence of life imprisonment exceeds the statutory maximum penalty applicable to the RICO offense. Specifically, he argues that the district court was not authorized to impose a sentence above 20 years' imprisonment because the racketeering act identified in the jury's special verdict, Sandoval's murder of Guzman, cannot be used to enhance Sandoval's sentence, as it was an act of "juvenile delinquency" under the JDA.

By statute, a defendant convicted of RICO conspiracy "shall be fined . . . or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both . . . ." 18 U.S.C. § 1963(a). "Racketeering activity" means "any act or

27

threat involving[, inter alia,] murder, . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). Under Georgia law,[10] "[a] person convicted of the offense of murder shall be punished by death or by imprisonment for life . . . ." O.C.G.A. § 16-5-1(d).

The JDA places limits on when a minor may be tried. "A juvenile alleged to have committed an act of juvenile delinquency" cannot be tried in federal court unless the Attorney General issues a certification to the trial court. 18 U.S.C. § 5032. A "juvenile" is any "person who has not attained his [18th] birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his [21st] birthday . . . ." 18 U.S.C. § 5031. An act of "'juvenile delinquency' is the violation of a law of the United States committed by a person prior to his [18th] birthday which would have been a crime if committed by an adult . . . ." Id. The crucial date for determining the age of the defendant and thus the applicability of the JDA is the date on which the government institutes proceedings by filing an indictment. In re Martin, 788 F.2d 696, 697-98 (11th Cir. 1986).

This circuit has recognized that "[u]nlike most federal offenses, conspiracy is a continuing crime." United States v. Cruz, 805 F.2d 1464, 1475 (11th Cir.

_____

[10] Because the murder in question was committed in Georgia, that is the relevant state's law for the purposes of § 1961(1).

28

1986).  In Cruz, we noted, "[t]he Juvenile Delinquency Act does not, of course, prevent an adult criminal defendant from being tried as an adult simply because he first became embroiled in the conspiracy with which he is charged while still a minor . . . ."  Id. (quoting United States v. Spoone, 741 F.2d 680, 687 (4th Cir. 1984)).  Once it has been established that a defendant's "participation in a conspiracy continued after his eighteenth birthday, then he may be tried as an adult.  In his trial as an adult, only the strictures imposed by the Federal Rules of Evidence may limit the activities of the prosecutor."  Id. at 1476.

Sandoval concedes that he could be tried for conspiracy as an adult and that evidence of crimes that were committed prior to his eighteenth birthday could be used as evidence of his guilt, but paradoxically argues that this same evidence could not be used to enhance his sentence.  Sandoval cites no authority in support of this argument.  To the contrary, in United States v. Gibbs, 182 F.3d 408 (6th Cir. 1999), the Sixth Circuit addressed a drug distribution case in which some of the drugs were distributed by the defendant prior to his eighteenth birthday and some were distributed after.  The court held that "as long as the government successfully prosecutes a defendant for a crime that occurred after the defendant reached the age of majority, the district court may consider relevant conduct that occurred before the defendant reached the requisite age" when sentencing, so long

29

as the prior conduct was part of the same course of conduct or common scheme or plan. Id at 442. Similarly, we conclude that in the context of a RICO conspiracy, if the defendant continues his participation in the activities of the conspiracy past the age of majority, those crimes may be considered for both determining guilt and his sentence. Sandoval continued his activities in Sur-13 past the age of majority, and thus the district court did not err by utilizing 18 U.S.C. § 1963(a) to enhance Sandoval's sentence based on the jury's finding that he committed the Guzman murder.

*J. Reasonableness of Sandoval's Sentence*

When sentencing Sandoval for his role in the RICO conspiracy, the district court gave the following explanation for its imposition of life imprisonment:

> Well the Court sets the sentence because of the guidelines and finds
> it's appropriate in the case because of the defendant's involvement. . .
> the Court has considered the factors in 18 U.S.C. Section 3553(a), and
> believes this particular sentence meets the sentencing criteria set out
> in that code section.

Sandoval argues that the sentence of life imprisonment is both procedurally and substantively unreasonable. First, as to procedural unreasonableness, Sandoval argues that the district court erred by treating the Guidelines as mandatory and failing to consider the § 3553(a) mitigating factors. Second, Sandoval argues that the sentence is substantively unreasonable because the court

30

should have taken into consideration that his offense level was increased because of an act of "juvenile delinquency," the disparity between his sentence and the sentences of those who pleaded guilty to other offenses, and that he joined the gang at a young age when many of his role models were gang members.

Procedural errors, such as treating the Guidelines as mandatory or failing to consider §3553(a) mitigating factors, are grounds for reversal. United States v. Beckles, 565 F.3d 832, 845 (11th Cir. 2009). If the district court did not procedurally err, this court reviews the substantive reasonableness of the sentence for abuse of discretion, based on the "totality of the circumstances." Id. The party challenging the reasonableness of a sentence "bears the burden of establishing that the sentence is unreasonable in the light of both [the] record and the factors in section 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). The district court need not "explicitly articulate that it ha[s] considered the § 3553(a) factors" and need not discuss each factor. United States v. Dorman, 488 F.3d 936, 944 (11th Cir. 2007). A lengthy discussion is not required in the typical case, so long as the district court "set[s] forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Rita v. United States, 551 U.S. 338, 356, 127 S. Ct. 2456, 2468 (2007). Even though a sentence is not per se reasonable by

31

virtue of residing within the Guidelines range, "there is a range of reasonable sentences from which the district court may choose, and when the district court imposes a sentence within the advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one." Talley, 431 F.3d at 788.

Sandoval has failed to establish procedural or substantive unreasonableness. The district court explicitly stated that it considered the § 3553(a) factors and did not need to individually discuss each of these factors. See Dorman, 488 F.3d at 944. Sandoval's sentence resides within the bounds of the Guidelines range and reflects his culpability for the Guzman murder. Sandoval's attempts to contrast his sentence with sentences received by other Sur-13 members are unpersuasive because (a) the other two defendants that the jury found committed murder also received life sentences for those crimes; and (b) unlike Sandoval, individuals that received lesser sentences cooperated with the government and accepted responsibility for their crimes. The district court did not err by sentencing Sandoval to life imprisonment.

### III. Conclusion

For the reasons set forth, the defendants' convictions and sentences are **AFFIRMED.**