[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14635
Non-Argument Calendar

_____

D.C. Docket No. 1:02-cr-00730-AT-AJB-14

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JULIO RAMOS,
a.k.a. Sleepy,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 9, 2020)

Before ROSENBAUM, GRANT, and TJOFLAT, Circuit Judges.

PER CURIAM:

After a jury trial, Julio Ramos was convicted of conspiracy to commit racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). He now appeals his conviction and sentence, arguing that insufficient evidence supported his conviction and that the district court improperly calculated his advisory guideline range. After careful review, we affirm Ramos's conviction and sentence.

## I.

In September 2003, a federal grand jury returned a superseding indictment charging Ramos and other members of the Brownside Locos ("Brownside Locos" or "BSL") with conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d) (Count 1). The pattern of racketeering activity, according to the indictment, involved robbery under O.C.G.A. § 16-8-40, murder and threats involving murder under O.C.G.A. §§ 16-5-1(a), 16-4-1, and 16-11-37, and drug-trafficking offenses under 21 U.S.C. § 841. In addition, Ramos and two other BSL members were charged with murdering Aldo Vallejo with malice aforethought for the purpose of maintaining and increasing position in the racketeering enterprise, in violation of 18 U.S.C. § 1959(a)(1) (Count 8).

Ramos pled not guilty, and a jury trial commenced in October 2017. According to the trial evidence, the Brownside Locos were a street gang active in

2

metropolitan Atlanta from at least 1997 through December 2002. New members were "jumped in" to the gang by fighting three other gang members for a short period. After this initiation, new gang members were given a nickname and were required to get a BSL tattoo within several days. The members identified themselves to each other and to rival gangs by wearing the color khaki and by making hand signs that formed the letters BSL.

The Brownside Locos held meetings at which members discussed the work they had done for the gang and any actions the gang needed to take, such as retaliation against rival gangs. BSL members were expected to "put in work" for the gang. That work included selling drugs, committing robberies and thefts, spray-painting or "tagging" to mark gang territory, and committing crimes of violence, including shootings, against rival gang members. BSL members who failed to put in work, violated BSL rules, or missed a mandatory meeting were given a "violation," which involved a beating. Meetings were mandatory when the gang needed to discuss some significant action, such as a retaliatory shooting.

Alejandro Cantu testified that he was an active BSL member from 1997 through August 2002. Cantu put in work for the gang primarily by selling drugs, including cocaine, marijuana, "ice," and pills. He used other BSL members as drivers to engage in these activities. Cantu drove to Texas to purchase marijuana

3

and to Tennessee to sell cocaine and marijuana. Proceeds from these drug-trafficking activities were used to support gang activities.

Testimony established that Ramos was a BSL member from at least March or April 2002 through October 27, 2002. One BSL member, Rigoberto Lara, testified that Ramos was a BSL member when Lara joined the gang in early 2002, and that Ramos remained a member through October 27, 2002, when Lara implicated Ramos in a shooting that resulted in the death of Vallejo, a rival gang member. Another BSL member, Erik Malinen, testified that he (Malinen) joined the Brownside Locos in 1999 or 2000 and remained a member through 2002. Malinen met Ramos multiple times and saw him at BSL meetings.

The bulk of the trial evidence pertained to the October 27, 2002, shooting. On that date, according to the evidence, Ramos was in a van with several others, some of whom were BSL members, when the occupants spotted a car being driven by Vallejo, a rival gang member. The van followed Vallejo's car as it exited a parking lot and got onto Interstate 85. At some point, Vallejo realized his car was being followed and attempted to get away. A gun fight ensued between occupants of the van and the car. Vallejo was hit by two bullets fired from the van and died of his injuries two days later.

4

At the close of the government's case, Ramos moved for a judgment of acquittal under Rule 29, Fed. R. Crim. P., citing two grounds. First, Ramos contended that the evidence failed to establish a nexus between the Brownside Locos' activities and interstate commerce. Second, Ramos argued that the government failed to prove that the defendant committed the state offense of murder with malice aforethought as charged in the indictment.

The district court denied the Rule 29 motion. As to the first argument, the court found that, while the evidence of a nexus was "thin," enough of a nexus existed between the Brownside Locos' drug-trafficking activities and interstate commerce, regardless of whether Ramos was aware of those activities or not. As to the second argument, the court found that there was sufficient evidence for the jury. Ramos rested without putting on evidence, and he renewed his prior motion for judgment of acquittal. The district court denied the renewed motion.

The jury returned a verdict finding Ramos guilty of a "RICO conspiracy not involving murder with malice aforethought," but not guilty of a "RICO conspiracy involving murder with malice aforethought" and of committing a "violent crime in aid of racketeering activity—murder with malice aforethought."

5

## II.

In Ramos's presentence investigation report ("PSR"), a probation officer calculated Ramos's recommended guideline imprisonment range under U.S.S.G. § 2E1.1, the guideline for RICO offenses. According to § 2E1.1, the base offense level for RICO offenses is the greater of 19 or "the offense level applicable to the underlying racketeering activity," which, if the underlying conduct violates state law, is determined based on "the most analogous federal offense." U.S.S.G. § 2E1.1 & cmt. n.2. Finding that murder was the most analogous offense to the underlying racketeering activity, the probation officer recommended a base offense level of 43. With no other adjustments and a criminal-history category of III, Ramos's guideline range was 240 months, due to the statutory maximum sentence of 20 years. Ramos objected and argued that, because he had been acquitted of murder, the offense level should be 19.

The district court held four sentencing hearings to determine the appropriate offense level. Ultimately, the district court found the following relevant facts: Ramos was a passenger in the van during the October 27, 2002, shooting; the rival gang fired the first shot; the van's occupants committed an aggravated assault; and Ramos did not possess or fire a gun. Based on these factual findings, the district court concluded that the underlying racketeering activity constituted criminal

6

attempt to commit threats of murder or terroristic threats, and that the most analogous guideline for that conduct was aggravated assault, § 2A2.2.  Applying a base offense level of 15 for aggravated assault under § 2A2.2, the court then applied a nine-level enhancement for discharge of a weapon and injuries to the victim.  With an offense level of 24 and a criminal-history category of III, the court found that Ramos's guideline range was 63 to 78 months of imprisonment.  The district court sentenced Ramos to 78 months of imprisonment.

Ramos now appeals, presenting three arguments.  First, he argues that insufficient evidence established the required nexus to interstate commerce.  Second, he contends that insufficient evidence supported the jury's verdict that he was guilty of a RICO conspiracy not involving malice murder.  Third, he argues that the district court erred in using U.S.S.G. § 2A2.2 to calculate his guideline range.

**III.**

We first consider whether the government proved the required nexus to interstate commerce.  We review *de novo* the denial of a motion for judgment of acquittal challenging the sufficiency of the evidence to support a guilty verdict.  *United States v. Albury*, 782 F.3d 1285, 1293 (11th Cir. 2015).  "[W]e view the evidence in the light most favorable to the verdict, and draw all reasonable inferences and credibility choices in the verdict's favor."  *Id.* (alteration adopted) (quotation

7

marks omitted).  "We will not overturn a verdict if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  *Id.* (quotation marks omitted).

"One of the elements of a RICO conspiracy is that the defendant agreed to participate in the affairs of an enterprise affecting interstate commerce."  *United States v. Flores*, 572 F.3d 1254, 1267 (11th Cir. 2009); *see* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.").  Only a "slight effect" on interstate commerce is required to satisfy RICO's interstate commerce requirement.  *Flores*, 572 F.3d at 1267 (quoting *United States v. Beasley*, 72 F.3d 1518, 1526 (11th Cir. 1996)).

Ramos's central argument is that no evidence linked his activities to interstate commerce.  But "[i]t is well established that the enterprise, and not the individual charged with violating the statute, must engage in or affect interstate commerce."  *United States v. Norton*, 867 F.2d 1354, 1359 (11th Cir. 1989).  In other words, the government need not present "evidence directly linking the activities of the

8

coconspirators with interstate commerce." *United States v. Stratton*, 649 F.2d 1066, 1075 (5th Cir. July 1981).[1]

Here, sufficient evidence satisfied RICO's minimal interstate commerce requirement. The evidence showed that the Brownside Locos gang, as an enterprise, was engaged in interstate drug trafficking. Specifically, BSL member Cantu testified that he crossed state lines to conduct drug deals that benefitted the Brownside Locos. These activities sufficiently show that the "enterprise engaged in . . . interstate . . . commerce." 18 U.S.C. § 1962(c); *see United States v. Baston*, 818 F.3d 651, 664 (11th Cir. 2016) (stating that an entity acts "in commerce" if it "uses the channels or instrumentalities of interstate commerce to facilitate their commission"); *United States v. Ballinger*, 395 F.3d 1218, 1232 (11th Cir. 2005) ("in commerce" includes "movement o[f] people or things across interstate borders"). Moreover, conduct that is "in commerce" "necessarily affect[s] commerce as well." *Baston*, 818 F.3d at 665. Construed in the light most favorable to the verdict, the government's evidence was more than enough to establish the necessary "slight effect" on interstate commerce. *See Flores*, 572 F.3d at 1267.

---

[1] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

9

## IV.

Ramos next argues that the government failed to prove he was guilty of a RICO conspiracy not involving murder.  Ordinarily, we review sufficiency challenges *de novo*.  *Albury*, 782 F.3d at 1293.  But "[w]hen a defendant raises specific challenges to the sufficiency of the evidence in the district court, but not the specific challenge he tries to raise on appeal, we review his argument for plain error." *Baston*, 818 F.3d at 664.  Generally, this means that "the defendant must shoulder a somewhat heavier burden:  we will reverse the conviction only where doing so is necessary to prevent a manifest miscarriage of justice." *United States v. Fries*, 725 F.3d 1286, 1291 & n.5 (11th Cir 2013) (quotation marks omitted).  "This standard requires us to find either that the record is devoid of evidence of an essential element of the crime or that the evidence on a key element of the offense is so tenuous that a conviction would be shocking." *Id.* at 1291 (quotation marks omitted).

## A.

It is unlawful for any individual to conspire to violate RICO's substantive provisions under § 1962(a), (b), and (c).  18 U.S.C. § 1962(d); *United States v. Gonzalez*, 921 F.2d 1530, 1539 (11th Cir. 1991).  "To establish a RICO conspiracy, the government must prove that the defendant[] objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the

10

enterprise through the commission of two or more predicate crimes." *United States.*

*Godwin*, 765 F.3d 1306, 1323 (11th Cir. 2014) (quotation marks omitted). A RICO

conspiracy "may be shown in two ways: (1) showing an agreement on the overall

objective of the conspiracy, or (2) showing that a defendant agreed to commit

personally two predicate acts, thereby agreeing to participate in a single objective."

*United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007) (quotation marks

omitted). If the government proves the first route, it need not prove the second. *Id.*

Here, there is no evidence that Ramos personally committed two predicate acts, so

we focus on the first route.

The government may prove agreement on an overall objective by direct or

circumstantial evidence. *See id.* When the evidence is circumstantial, the jury must

be able to infer that the "defendant necessarily must have known that the others were

also conspiring to participate in the same enterprise through a pattern of

racketeering." *Id.*; *United States v. To*, 144 F.3d 737, 744 (11th Cir. 1998). The jury

is not limited to considering the commission of the specific predicate acts that were

alleged in the indictment but rather may consider any acts of the type alleged by an

indictment as predicates that occurred during the life of the conspiracy. *Browne*,

505 F.3d at 1274. Also, the government is not required to prove that the defendant

knew every co-conspirator, was aware of all the details of the conspiracy, or

11

contemplated participating in the same offenses as other coconspirators.  *Id.* Nevertheless, "[a] defendant must be convicted on the basis of his own proven conduct, association is not enough."  *Gonzalez*, 921 F.2d at 1542.

**B.**

Ramos seeks reversal of his RICO conspiracy conviction on grounds that there was insufficient evidence to show that two predicate crimes of robbery or drug trafficking even occurred or, if they did occur, that he had any connection to or knowledge of them.  We review this argument for plain error.  Although Ramos generally argued the lack of evidence connecting him to any drug-trafficking activities when moving for a judgment of acquittal, Ramos did not specifically request a judgment of acquittal based on insufficient evidence of the predicate offenses, nor did the district court interpret his arguments in that way.  *See Baston*, 818 F.3d at 664.  Rather, Ramos's arguments in this regard were in service of his challenge to the evidence of an interstate nexus.  Because his current arguments were raised for the first time on appeal, Ramos must show that reversal of his conviction is "necessary to prevent a manifest miscarriage of justice."  *Fries*, 725 F.3d at 1291.

Ramos has not met that "heavier burden."  *Id.*  Construed in the light most favorable to the government, the evidence showed that Ramos was a member of the Brownside Locos from March or April 2002 through at least October 27, 2002.  The

12

jury heard testimony that Ramos helped initiate Lara into the gang in early 2002, that he was seen by and photographed with other BSL gang members, that he was known to the gang by the name "Sleepy," that he was present at the shooting on October 27, 2002, and that he attended at least one BSL meeting. At the meetings, some of which were mandatory, BSL members discussed the crimes they committed on behalf of the Brownside Locos. Cantu testified that he sold cocaine, marijuana, "ice," and pills, and that proceeds from these activities were used to support gang activities. Another BSL member testified that "putting in work" for the gang included engaging in street-level drug sales. Thus, the government put on evidence to establish that the Brownside Locos were involved in a pattern of racketeering that involved drug-trafficking offenses.

Although the evidence connecting Ramos to this drug-trafficking activity is weaker than the evidence concerning the shooting, it was not "so tenuous that a conviction would be shocking." *Fries*, 725 F.3d at 1291. The government was not required to prove that Ramos knew all the details of this conduct or that he contemplated participating in the same offenses as other coconspirators. *Browne*, 505 F.3d at 1264. It is enough for the evidence to show that the "defendant necessarily must have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering" that involved drug-trafficking

offenses. *Id.*; *To*, 144 F.3d at 744. And we conclude that the evidence of Ramos's active membership in the Brownside Locos for at least six months during 2002 is enough to show that reversal of his conviction is not "necessary to prevent a manifest miscarriage of justice." *See Fries*, 725 F.3d at 1291.

## V.

Finally, Ramos argues that the district court erred in calculating his guideline range based on U.S.S.G. § 2A2.2. First, he contends that the court necessarily relied on acquitted conduct in sentencing him, and that the use of acquitted conduct at sentencing violated his rights under the Fifth and Sixth Amendments. Second, he maintains that instead of § 2A2.2, the court should have used § 2A6.1 or found that no analogue existed.

We review the district court's application of the sentencing guidelines *de novo* and its findings of fact for clear error. *United States v. Grant*, 397 F.3d 1330, 1332 (11th Cir. 2005). A district court commits clear error if we are "left with a definite and firm conviction that a mistake has been committed," but "[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016) (quotation marks omitted) (alteration in original).

14

The base offense level for a RICO violation is the greater of 19 or "the offense level applicable to the underlying racketeering activity."   U.S.S.G. § 2E1.1(a). According to the commentary to § 2E1.1, where the underlying conduct violates state law, "the offense level corresponding to the most analogous federal offense is to be used."   U.S.S.G. § 2E1.1. cmt. n.2.   And where there is more than one underlying offense, the district court should "treat each underlying offense as if contained in a separate count of conviction" when determining the greater offense level.  *Id.* cmt. n.1.

The district court in this case, after a thorough and conscientious consideration of the evidence, the jury verdict, and the relevant law, determined that the underlying racketeering activity constituted criminal attempt to commit threats of murder or terroristic threats, as alleged in the indictment, and that the most analogous guideline was aggravated assault, § 2A2.2.  We see no error in the court's analysis.

First, our review of the record indicates that the district court strenuously attempted to avoid using acquitted conduct as part of its sentencing considerations. The court expressly excluded malice murder and attempted malice murder from its consideration.  And it rejected the PSR's reliance on the murder guideline, greatly reducing the guideline range.  While the court then found that the underlying conduct involved threats of murder or terroristic threats, we cannot say the jury rejected the

15

facts necessary to make that determination when reaching its not guilty verdict on the charge of a RICO conspiracy involving malice murder. *See United States v. Maddox*, 803 F.3d 1215, 1221 (11th Cir. 2015) ("[B]ecause it is impossible to know exactly why a jury found a defendant not guilty on a certain charge, a jury cannot be said to have necessarily rejected any particular fact when it returns a general verdict of not guilty." (quotation marks omitted)).

In any event, and as Ramos acknowledges, this Circuit's caselaw permits sentencing courts to rely on acquitted conduct at sentencing, so long as the judge does not impose a sentence that exceeds what is authorized by the jury verdict. *E.g.*, *Untied States v. Faust*, 456 F.3d 1342, 1348 (11th Cir. 2006) ("[U]nder an advisory Guidelines scheme, courts can continue to consider relevant acquitted conduct so long as the facts underlying the conduct are proved by a preponderance of the evidence and the sentence imposed does not exceed the maximum sentence authorized by the jury verdict."). The court did not impose a sentence in excess of the statutory maximum of 20 years authorized by the jury verdict. And, notably, Ramos does not argue that insufficient evidence supported the district court's factual findings. Accordingly, even assuming the district court necessarily relied on acquitted conduct, that reliance did not violate Ramos's constitutional rights under

16

the Fifth or Sixth Amendments.  *See id.* at 1347–48; *United States v. Culver*, 598 F.3d 740, 752 53, 753 n.9 (11th Cir. 2010).

Second, the district court did not err in determining that the guideline provision applicable to federal offenses involving aggravated assault, § 2A2.2, was sufficiently analogous to the RICO predicate offense of threats involving murder or terroristic threats.  Under Georgia law, an individual makes a "terroristic threat" when he threatens to commit a crime of violence against an individual with the purpose of terrorizing that individual.  O.C.G.A. § 16-11-37(b).  An individual may be charged with making a terroristic threat by threatening another person with a gun. *See, e.g.*, *Wilson v. State*, 661 S.E.2d 634, 634–35 (Ga. Ct. App. 2008) (upholding the conviction of a defendant who threatened the victim with a gun after a verbal confrontation).

Here, the district court made factual findings, amply supported by the record, that Ramos was present in the van during the events of October 27, 2002, during which occupants of the van fired upon occupants of another vehicle, causing serious bodily injury.  That conduct clearly falls within the aggravated-assault guideline, § 2A2.2, which covers "felonious assaults that are more serious than other assaults because of the presence of an aggravating factor, *i.e.*, serious bodily injury; the involvement of a dangerous weapon with intent to cause bodily injury; . . . or the

intent to commit another felony." *Id.* § 2A2.2 cmt. (backg'd).  So we cannot say that the court erred in concluding that § 2A2.2 was the most analogous guideline.  And because the resulting offense level was greater than 19, it was appropriate for the district court to apply § 2A2.2 instead of § 2E1.1's default offense level.  U.S.S.G. § 2E1.1(a).

Even though the state offense of making terroristic threats is not a perfect match for the offenses covered by § 2A2.2, the text of § 2E1.1 does not require an exact match.  *See* U.S.S.G. § 2E1.1., cmt. n.2.  And the district court's choice, in light of the underlying facts, was certainly a closer fit than § 2A6.1, the guideline proposed by Ramos.  Broadly speaking, both the state statute and § 2A2.2 encompass a serious threat with a gun.  *See Wilson*, 661 S.E.2d at 634–35; U.S.S.G. § 2A2.2 cmt. (backg'd).  By contrast, § 2A6.1 covers threatening communications generally and does not account for the use of a firearm.  Accordingly, we cannot say that the district court erred in calculating Ramos's guideline range.

## VI.

For these reasons, we affirm Ramos's conviction and sentence.

**AFFIRMED.**

18