[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 14-14444, 15-10923
_____

D.C. Docket No. 1:13-cr-20914-CMA-1

UNITED STATES OF AMERICA,

Plaintiff–Appellee–Cross Appellant,

versus

DAMION ST. PATRICK BASTON,
a.k.a. R.A.B.,
a.k.a. Drac,
a.k.a. "D",
a.k.a. Daddy,

Defendant–Appellant–Cross Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(March 24, 2016)

Before WILLIAM PRYOR and FAY, Circuit Judges, and ROBRENO,[*] District
Judge.

_____

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

WILLIAM PRYOR, Circuit Judge:

This appeal and cross-appeal require us to review the convictions and sentence of Damion Baston, an international sex trafficker nicknamed "Drac" (short for Dracula) who sometimes dressed up as a vampire, complete with yellow contact lenses and gold-plated fangs. Baston forced numerous women to prostitute for him by beating them, humiliating them, and threatening to kill them, and he pimped them around the world, from Florida to Australia to the United Arab Emirates. Baston challenges the sufficiency of the evidence for one conviction, a supplemental jury instruction, and the award of restitution to his victims. Those challenges fail, but the cross-appeal by the government about a refusal to award one victim increased restitution has merit.

The government argues that the district court erred when it refused to award restitution to a victim of Baston's sex trafficking in Australia. The district court ruled that an award of restitution for Baston's extraterritorial conduct would exceed the power of Congress under Article I of the Constitution, U.S. Const. Art. I, and the Due Process Clause of the Fifth Amendment, *id.* Amend. V. To decide those issues, we must examine the scope of the Foreign Commerce Clause, *id.* Art. I, § 8, cl. 3, a question of first impression in this Circuit, and the constitutionality of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 § 223, 18 U.S.C. § 1596(a)(2), a question of first

2

impression in any circuit. We conclude that Congress has the constitutional authority to punish sex trafficking by force, fraud, or coercion that occurs overseas. We affirm Baston's convictions and sentence, but we vacate his order of restitution and remand with an instruction for the district court to increase his restitution obligation.

## I. BACKGROUND

Baston immigrated to the United States from Jamaica in 1989. After he was convicted of an aggravated felony, Baston was ordered removed in 1998. But Baston illegally reentered the country by purchasing the identity of a citizen of the United States. Under this assumed identity, Baston opened bank accounts, started businesses, and rented apartments in Florida. He also obtained a Florida driver's license and a United States passport. Baston traveled the world under the assumed identity, visiting Australia, New Zealand, Indonesia, the United Arab Emirates, Russia, China, and Brazil, among other places. Baston funded his lavish lifestyle by forcing numerous women to prostitute for him.

Baston learned how to be a pimp from *Pimpology*, a book written by Pimpin' Ken. Consistent with the fifth law of *Pimpology*, Baston "prey[ed] on the weak" by recruiting women who were sexually abused as children. *See* Pimpin' Ken, *Pimpology: The 48 Laws of the Game* 21 (2008). Baston also forced his

3

victims to refer to him as "Daddy," *see id.*, and took all of the money they earned, *see id.* at 20.

But Baston was not always faithful to the laws of *Pimpology*. Unlike Pimpin' Ken who rejected the use of violence, *see id.* at 2–3, Baston punched, slapped, choked, and threatened to kill his victims whenever they got "out of line." And his victims took those threats seriously. In addition to his Transylvanian tendencies, Baston maintained a muscular physique aided by having his victims inject him with steroids on a regular basis. He also claimed to be a member of the Bloods gang.

K.L., an Australian, met Baston at a nightclub in Gold Coast, Australia, when she was 24 years old. She dreamed of opening her own restaurant, and Baston offered to help her. But K.L. soon discovered that Baston's real business was pimping women. Baston sent K.L. to have sex with clients throughout Australia at prices he determined. When Baston was not in Australia, he had K.L. wire her earnings to his bank accounts in Miami. K.L. also prostituted for Baston in the United Arab Emirates, Florida, and Texas.

K.L. testified that Baston beat her "often" and that he threatened to hurt her and her family if she ever stopped working for him. Baston would backhand K.L. whenever she committed any perceived slight, like failing to cook him breakfast or telling a bouncer how much money she made. One night, Baston suspected that

4

K.L. was cheating on him. He woke her up, punched her hard in the pelvis, threw her to the ground, and strangled her. He heated up kitchen knives over an open flame and threatened to slit her throat. On another occasion, Baston took K.L. to the bathroom, held her against the wall by her throat, and bit her cheek until she bled. K.L. eventually escaped Baston's control after her family contacted the American embassy, which refused to let her return to Baston in the United States.

T.M. was 21 years old when she met Baston. She was attending Georgia Southern University and needed money for college. She sent pictures of herself to one of Baston's associates, who convinced her to come to Miami to work as an escort. After she arrived in Miami, T.M. met Baston at a nightclub. He convinced her to work at various strip clubs in Miami, where she would meet clients and have sex with them at prices set by Baston. T.M. also prostituted for Baston in Texas and Australia.

Baston often reminded T.M. that, if she ever left him, "it wouldn't be good" for her or her family. One night, Baston thought that T.M. was flirting too much with a client. He drove her to a secluded park and backhanded her so hard that she fell to the ground. He reminded T.M. that he could bury her in the park and no one would ever find her. On another occasion, Baston thought T.M. was being "disrespectful," so he wrapped a belt around her neck and made her beg for forgiveness while she crawled around on her hands and knees like a dog. T.M.

5

mustered the courage to flee from Baston when he temporarily left the country to visit Jamaica.

J.R. met Baston in 2013. She was 21 years old at the time, living with her mother in Georgia and working at a Little Caesars restaurant. But J.R. dreamed of being a model. Baston saw her modeling pictures on Instagram and began communicating with her over the Internet and phone. Baston promised to help her modeling career and convinced her to take a bus from Georgia to Miami. When she arrived, Baston forced her to prostitute for him at various strip clubs. J.R. also prostituted for him in Georgia, Louisiana, Texas, Tennessee, and New York. Baston and J.R. typically stayed in hotels, most often a Marriott in Miami, and Baston advertised her services on Backpage.com. Whenever J.R. was supposed to be working for Baston, she had to call him "[e]very hour on the hour" and text him regularly.

If J.R. disobeyed his orders, Baston would punch her in the face. One night, Baston drove J.R. to a secluded parking lot and told her not to "fuck with him" or he would "chop . . . [her] body up and have [her] thrown in the Everglades." On another occasion, J.R. and Baston got into an argument and, although J.R. was pregnant at the time, Baston punched her in the side and threatened to stab her with a broken broom. Baston later forced J.R. to have an abortion because he "didn't want to have a baby by a punk bitch."

6

Baston was arrested at his mother's house in New York. A grand jury indicted him on 21 counts, including sex trafficking of K.L. by force, fraud, or coercion, 18 U.S.C. § 1591(a)(1), "in the Southern District of Florida, Australia, the United Arab Emirates, and elsewhere"; sex trafficking of T.M., *id.*, "in the Southern District of Florida[] and elsewhere"; sex trafficking of J.R., *id.*, "in the Southern District of Florida[] and elsewhere"; and several counts of money laundering, *id.* § 1956, based on the sex-trafficking proceeds that Baston wired from Australia to Miami. Baston proceeded to trial on all 21 counts.

The government called several of Baston's victims as witnesses, including K.L., T.M., and J.R. The women testified about how they met Baston, how their relationships progressed, and how Baston used violence and coercion to force them into prostitution. They also testified about how often they prostituted for Baston and how much they charged their clients.

After the government presented its case-in-chief, Baston filed a motion for a judgment of acquittal. He challenged the sufficiency of the evidence "on the indictment as a whole" by raising specific arguments against each count. With respect to the charge of sex trafficking J.R., Baston argued that he never coerced J.R. into prostitution: she was already a prostitute when he met her, and their relationship was nothing but amicable. The district court denied Baston's motion.

Baston called three witnesses: his sister, his mother, and himself. Baston's defense to the counts of sex trafficking was that he did not coerce any of the victims into prostitution; they did it freely and voluntarily. Baston argued that K.L. and T.M., for example, prostituted in Australia because it is legal there and they could make a lot of money doing it. With respect to the counts of money laundering, Baston argued in closing that "money made in Australia from a legal brothel is legal" so "sending the money by . . . wire transfer is not money laundering because there is nothing illegal about that money."

After the close of all evidence, Baston renewed his motion for a judgment of acquittal "for the reasons that were previously indicated." The district court again denied it. Before the district court instructed the jury, Baston stated that he had "[n]o problems" with the instructions and was "in agreement" with them.

On the second day of deliberations, the jury submitted the following note to the district court:

> If prostitution is legal in [A]ustralia, and money was made there by those means, would it be illegal to transfer funds abroad? Specical[l]y the United States? Which laws are we to consider?

The district court answered the jury's question with the following supplemental instruction:

> With respect to Counts 13–21 [the counts of money laundering], . . . the unlawful activity in question is the recruiting, enticing, harboring, transportation, providing, obtaining, or maintaining a person, knowing, or in reckless disregard of the fact that means of force,

8

threats of force, fraud, coercion, or any combination of such means would be used to cause that person to engage in a commercial sex act, in violation of U.S. federal law, that is, 18 U.S.C. sections 1591 and 1596. Under U.S. law, such conduct is illegal, even if it took place outside the United States, if the defendant was present in the United States at the time he was charged. As always, you should consider all of my instructions as a whole.

Baston objected to this instruction because it "involved a legal interpretation of the Statutes not includ[ed in] the Jury Instructions" and "introduced new theories to the case without the Defense being given the opportunity to argue [them]." The district court rejected these arguments.

The jury convicted Baston of all 21 counts. The district court sentenced him to 27 years of imprisonment and a lifetime of supervised release. It ordered a separate hearing on restitution.

The district court ordered Baston to pay $99,270 in restitution: $78,000 to K.L., $11,200 to T.M., and $10,070 to J.R. The district court calculated these amounts based on worksheets provided by the government, which multiplied the hours that the victims prostituted for Baston by the amounts that they charged and then subtracted their estimated living expenses. The victims' earnings were calculated based on their testimony from trial; the district court did not require the victims to testify a second time at the restitution hearing.

The $78,000 award to K.L. included the money she earned while prostituting for Baston in the United States, but excluded the $400,000 she earned while

9

prostituting for Baston in Australia. Baston objected that a restitution award based on conduct that occurred wholly overseas would exceed the authority of Congress under the Foreign Commerce Clause and the Due Process Clause. The district court sustained the objection by stating that "the government is overreaching and seeking amounts in restitution that aren't supported by . . . the constitution."

## II. STANDARDS OF REVIEW

Several standards of review govern this appeal and cross-appeal. We review the sufficiency of the evidence *de novo*. *United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005). We review a supplemental jury instruction for abuse of discretion, but we review *de novo* whether the instruction misstated the law or misled the jury. *United States v. James*, 642 F.3d 1333, 1337 (11th Cir. 2011). We review the factual findings underlying a restitution order for clear error, *United States v. Washington*, 434 F.3d 1265, 1267 (11th Cir. 2006), and we review the procedures used at the restitution hearing for abuse of discretion, *United States v. James*, 459 F.2d 443, 445 (5th Cir. 1972). We review the legality of a restitution order *de novo*. *United States v. Rodriguez*, 751 F.3d 1244, 1260 (11th Cir. 2014).

## III. DISCUSSION

We divide our discussion into two main parts. We address Baston's appeal first. We then address the cross-appeal by the government.

10

### A. Baston's Appeal

Baston raises three arguments on appeal. First, Baston argues that the district court abused its discretion when it issued the supplemental jury instruction. Second, Baston contends that the district court should have granted his motion for a judgment of acquittal because the government provided insufficient evidence that his trafficking of J.R. was "in or affecting interstate . . . commerce," 18 U.S.C. § 1591(a)(1). Third, he contends that the district court used unreliable testimony to calculate his restitution obligations. We address each argument in turn.

### 1. The District Court Did Not Abuse Its Discretion by Issuing the Supplemental Jury Instruction.

Baston argues that the supplemental jury instruction was an abuse of discretion for three reasons: it did not answer the jury's question, it misled the jury, and it misstated the law. But Baston has a problem: he made none of these arguments in the district court.

Because Baston is challenging the supplemental jury instruction for the first time on appeal, we review his arguments for plain error. Fed. R. Crim. P. 52(b). The government argues that we should not review Baston's arguments at all because he affirmatively agreed to the initial jury instructions in the district court. Under the doctrine of invited error, "[w]here a party expressly accepts a jury instruction, 'such action . . . serve[s] to waive [his] right to challenge the accepted instruction on appeal.'" *United States v. House*, 684 F.3d 1173, 1196 (11th Cir.

11

2012) (third and fourth alterations in original) (quoting *United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005)). But "the issue here is the supplemental instruction given in response to the [jury's] question—not the initial instruction[s]." *United States v. Isnadin*, 742 F.3d 1278, 1297 (11th Cir. 2014). Although Baston agreed to the initial jury instructions, he did not agree to the supplemental jury instruction. Baston instead failed to object to the supplemental jury instruction on the specific grounds he raises on appeal. But "failing to object does not trigger the doctrine of invited error." *United States v. Dortch*, 696 F.3d 1104, 1112 (11th Cir. 2012). When a defendant objects to a jury instruction in the district court, but on different grounds than the ones he raises on appeal, we review the instruction for plain error. *See* Fed. R. Crim. P. 30(d).

We now turn to Baston's three challenges to the supplemental jury instruction. None identifies an abuse of discretion by the district court. "[T]he court's supplemental instruction[] w[as] sufficiently clear and responsive to the jury's inquiry to fall squarely within the trial court's range of discretion in this area." *United States v. Fuiman*, 546 F.2d 1155, 1160 (5th Cir. 1977). Because the district court did not err, it did not plainly err either. *United States v. Franklin*, 694 F.3d 1, 9 (11th Cir. 2012).

12

a.  The Supplemental Jury Instruction Answered the Jury's Question.

Baston contends that the supplemental jury instruction did not answer the jury's question. "When a jury makes explicit its difficulties," the district court "should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946). The district court instructed the jury that it could convict Baston of money laundering whether or not prostitution is legal in Australia. This answer was non-responsive, according to Baston, because the jury asked whether the legality of prostitution affected the charges of sex trafficking. At trial, Baston argued that he did not coerce K.L. or T.M. into prostitution; instead, they prostituted because it was legal in Australia and they could make money doing it. Baston contends that the jury wanted more information about this defense.

The problem with Baston's argument is that the jury did not ask about sex trafficking. The jury asked about money laundering: its note asked whether it would be "illegal to *transfer funds*" to the United States "[i]f prostitution is legal in [A]ustralia[] and *money* was made there by those means." (Emphases added.) And the note asked a legal question about choice of law—"Which laws are we to consider?"—not a factual question about the victims' motives for prostituting in Australia. Tellingly, the jury's question mirrored the choice-of-law argument that Baston made in his closing argument.

13

The district court answered this question, and its answer must have been satisfactory because the jury asked no further questions about money laundering or sex trafficking after receiving the supplemental instruction. "[T]hat there was no further inquiry after the judge's response to the note [] indicates that the judge's response cleared the jury's difficulty with concrete accuracy." *United States v. Parr*, 716 F.2d 796, 809 (11th Cir. 1983) (second alteration in original) (quoting *United States v. Andrew*, 666 F.2d 915, 922 (5th Cir. 1982)). The district court did not abuse its discretion by answering the question that the jury actually asked instead of the question that Baston now argues it asked.

   b.  The Supplemental Jury Instruction Did Not Mislead the Jury.

Baston argues that the supplemental jury instruction misled the jury by suggesting it no longer needed to find that Baston's conduct was "in or affecting" commerce, 18 U.S.C. § 1591(a)(1), an essential element of sex trafficking. The supplemental instruction essentially erased this element, according to Baston, by not repeating it and by stating that he could be convicted so long as he "was present in the United States at the time he was charged." We disagree.

The jury was not misled by the supplemental jury instruction because the supplemental instruction said nothing about the elements of sex trafficking. As explained above, the jury's note asked only about money laundering, and the supplemental instruction addressed only that offense. Indeed, the instruction began

14

with a prefatory clause—"With respect to Counts 13–21"—that specifically referred to the counts of money laundering. The jury would not have understood the supplemental instruction as saying anything about the elements of sex trafficking.

Nor did the supplemental jury instruction need to repeat the elements of sex trafficking. Although sex trafficking was the "specified unlawful activity" for the counts of money laundering, *id.* § 1956, "[a] conviction for money laundering does not require proof that the defendant committed the specific predicate offense," *United States v. De La Mata*, 266 F.3d 1275, 1292 (11th Cir. 2001). A jury instruction on money laundering can omit the elements of the specified unlawful activity. *See United States v. Martinelli*, 454 F.3d 1300, 1311–12 (11th Cir. 2006). The district court did not confuse the jury by leaving out that unnecessary information. If any confusion somehow remained, the district court eliminated it by reminding the jury to "consider all of my instructions as a whole." *See Parr*, 716 F.2d at 809. The jury could refer to the initial jury instructions, which correctly stated the elements of sex trafficking and the requirement that Baston's conduct be "in or affecting" commerce. Because "the district court's additional instruction was responsive to the jury's specific concern while prudently refocusing the jury on the instructions . . . as a whole," *United States v. Davis*, 490 F.3d 541, 548 (6th Cir. 2007), the district court did not abuse its discretion.

15

c.  The Supplemental Jury Instruction Did Not Misstate the Law.

Baston contends that the supplemental jury instruction misstated the law because it failed to explain that he could not be convicted of sex trafficking unless he *knew* his conduct was in or affecting commerce. We rejected this argument in *United States v. Evans*, 476 F.3d 1176 (11th Cir. 2007), where we held that sex trafficking by force, fraud, or coercion does not "requir[e] knowledge by a defendant that his actions are in or affecting interstate commerce," *id.* at 1180 n.2; *accord United States v. Phea*, 755 F.3d 255, 265 (5th Cir. 2014); *United States v. Sawyer*, 733 F.3d 228, 230 (7th Cir. 2013). Baston contends that *Evans* was wrongly decided, but "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). And *Evans* has not been overruled or abrogated. Accordingly, the district court did not abuse its discretion because it was "under no obligation to give a requested instruction that misstates the law." *United States v. L'Hoste*, 609 F.2d 796, 805 (5th Cir. 1980).

Even if *Evans* was wrongly decided (which we doubt), Baston would still lose. As explained above, the jury's note asked about money laundering, not sex trafficking. If the supplemental jury instruction had discussed the knowledge element of sex trafficking, it would have been nonresponsive and confusing. When

16

a jury requests a supplemental instruction, the district court should answer "within the specific limits of the question presented." *United States v. Martin*, 274 F.3d 1208, 1210 (8th Cir. 2001) (quoting *United States v. Behler*, 14 F.3d 1264, 1270 (8th Cir. 1994)). The district court did not abuse its discretion by failing to discuss something that was irrelevant to the jury's question. If Baston disagreed about the elements of sex trafficking, he should have objected to the initial jury instruction that addressed that element, not the supplemental jury instruction.

2.  The District Court Did Not Err When It Denied Baston's Motion for a Judgment of Acquittal.

Baston contends that his conviction of sex trafficking J.R. was supported by insufficient evidence. A defendant is guilty of sex trafficking by force, fraud, or coercion if he "knowingly *in or affecting interstate or foreign commerce . . .* recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing . . . that means of force, threats of force, fraud, [or] coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1) (emphasis added). Baston contends that his trafficking of J.R. was not "in or affecting" interstate commerce. The question for our review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found [this element] beyond a reasonable doubt." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

17

The parties dispute our standard of review. The government argues that, because Baston did not contest the commerce element in the district court, we should review his challenge to the sufficiency of the evidence only for a "manifest miscarriage of justice." Baston contends that we should review his argument *de novo* because he raised a "general" challenge to the sufficiency of the evidence in the district court. Neither party is correct: we review Baston's argument for plain error. Fed. R. Crim. P. 52(b).

Our review is not limited to correcting a "manifest miscarriage of justice," contrary to the government's argument. That standard does not apply unless the defendant makes *no* challenge to the sufficiency of the evidence after the close of all evidence. *See United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2012); *United States v. Tapia*, 761 F.2d 1488, 1491 (11th Cir. 1985). Baston challenged the sufficiency of the evidence in his renewed motion for a judgment of acquittal.

But our review is not *de novo* either, contrary to Baston's argument. He failed to raise the specific challenge to the sufficiency of the evidence that he now raises on appeal. Other circuits have held that a defendant preserves all challenges to the sufficiency of the evidence if he raises a "general" challenge in the district court. *See United States v. Cooper*, 654 F.3d 1104, 1117 (10th Cir. 2011); *United States v. Spinner*, 152 F.3d 950, 955 (D.C. Cir. 1998); *United States v. Hoy*, 137 F.3d 726, 729 (2d Cir. 1998). *But see United States v. Clarke*, 564 F.3d 949, 953–

18

54 (8th Cir. 2009). We need not decide whether those decisions are consistent with the law in this Circuit because, even if they are, Baston did not raise a "general" challenge to the sufficiency of the evidence. Although his motion for a judgment of acquittal challenged the sufficiency of the evidence "on the indictment as a whole," Baston challenged the "whole" indictment by raising *specific* arguments against each count. With respect to the count of sex trafficking J.R., Baston argued that he did not force her into prostitution; he did not argue that his conduct was not "in or affecting" commerce. When a defendant raises specific challenges to the sufficiency of the evidence in the district court, but not the specific challenge he tries to raise on appeal, we review his argument for plain error. *See United States v. Joseph*, 709 F.3d 1082, 1103 (11th Cir. 2013); *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007); *United States v. Hunerlach*, 197 F.3d 1059, 1068 (11th Cir. 1999).

Turning to the merits, we conclude that a rational juror could have found, beyond a reasonable doubt, that Baston's trafficking of J.R. was "in or affecting" interstate commerce. Because there was no error, there was no plain error either. *Franklin*, 694 F.3d at 9. The district court correctly denied Baston's motion for a judgment of acquittal.

Baston's conduct was in commerce. The phrase "in commerce" refers to the "channels" and the "instrumentalities" of interstate commerce. *United States v.*

19

*Ballinger*, 395 F.3d 1218, 1233 (11th Cir. 2005) (en banc). Baston used both when he trafficked J.R. He communicated with her by phone, text message, and Instagram; he convinced her to cross state lines on a bus; he advertised her services on Backpage.com; and he stayed with her in various hotels. Any one of these is sufficient to prove that Baston's conduct was "in commerce." *See United States v. Daniels*, 685 F.3d 1237, 1246 (11th Cir. 2012) (cell phone, interstate bus travel); *Evans*, 476 F.3d at 1179 (hotels that serve interstate travelers); *United States v. Pipkins*, 378 F.3d 1281, 1295 (11th Cir. 2004) (Internet), *vacated on other grounds*, 544 U.S. 902 (2005), *op. reinstated*, 412 F.3d 1251 (11th Cir. 2005).

Baston argues that none of his interstate conduct involved force, fraud, or coercion—the actus reus of the statute—and that his actual trafficking of J.R. occurred exclusively in Florida, but we disagree. Baston also trafficked J.R. in Louisiana, Texas, Tennessee, and New York. And even if we were to assume that Baston trafficked J.R. exclusively in Florida, we have held that a defendant whose "illegal acts ultimately occur intrastate" still acts "in commerce" if he "uses the channels or instrumentalities of interstate commerce to facilitate their commission." *Ballinger*, 395 F.3d at 1226. Baston's use of phones, the Internet, hotels, and buses facilitated his trafficking of J.R., so his conduct was "in commerce."

20

Alternatively, Baston's conduct affected commerce. The phrase "affecting commerce" is a term of art that "ordinarily signal[s] the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). That power reaches "purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). As we explained in *Evans*, sex trafficking by force, fraud, or coercion—even when it occurs "solely in Florida"—"ha[s] the capacity when considered in the aggregate . . . to frustrate Congress's broader regulation of interstate and foreign economic activity." 476 F.3d at 1179. Baston argues that *Evans* involved the sex trafficking of children, not women, but the reasoning in *Evans* cannot be limited to children. The statute prohibiting sex trafficking by force, fraud, or coercion is a valid exercise of Congress's full commerce power, so the government can satisfy the commerce element in that statute by proving that the defendant's conduct had "a minimal effect on interstate commerce." *United States v. Rodriguez*, 218 F.3d 1243, 1244 (11th Cir. 2000); *accord United States v. Walls*, 784 F.3d 543, 548 (9th Cir. 2015). That standard is easily satisfied here. Because Baston's conduct was in commerce, it necessarily affected commerce as well. *See United States v. Viscome*, 144 F.3d 1365, 1369 (11th Cir. 1998).

21

### 3. The District Court Did Not Clearly Err or Abuse Its Discretion in Calculating Baston's Restitution Obligations.

Baston's final argument on appeal is that the district court used unreliable evidence to calculate his restitution obligations to K.L., J.R., and T.M. The district court calculated the obligations based on the victims' testimony at trial: it multiplied how often the victims said they worked by how much they said they charged and then subtracted their estimated living expenses. Baston does not challenge the math; instead, he complains that the victims' testimony was unreliable because it was not subjected to rigorous cross-examination. Baston maintains that he had no occasion to cross-examine the victims about their earnings at trial because their earnings were not relevant to his guilt or innocence. Baston contends that the district court should have forced the victims to testify a second time at the restitution hearing so he could cross-examine them. This argument is meritless.

The district court did not clearly err or abuse its discretion by relying on the victims' trial testimony. In calculating a victim's losses, districts court can rely on any evidence "bearing 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Singletary*, 649 F.3d 1212, 1217 n.21 (11th Cir. 2011) (quoting *United States v. Bernardine*, 73 F.3d 1078, 1080–81 (11th Cir. 1996)). That evidence includes the "proof at trial." *United States v. Hairston*, 888 F.2d 1349, 1353 n.7 (11th Cir. 1989). Contrary to Baston's argument, evidence can be

22

sufficiently reliable for purposes of restitution even if it was not subjected to rigorous cross-examination. *See, e.g.*, *id.* at 1353 (relying on hearsay evidence); *In re Sealed Case*, 702 F.3d 59, 67 (D.C. Cir. 2012) (relying on grand jury testimony). And district courts are not required to hear live testimony at every restitution hearing. *See United States v. Sabhnani*, 599 F.3d 215, 258–59 (2d Cir. 2010). District courts have broad discretion in choosing the procedures to employ at a restitution hearing, "so long as the defendant is given an adequate opportunity to present his position as to matters in dispute." *United States v. Maurer*, 226 F.3d 150, 151 (2d Cir. 2000). Baston had the opportunity to challenge the victims' testimony at trial and again at the restitution hearing, and he still has not offered any specific reason why their testimony was inaccurate or untrustworthy. The district court committed no error.

## B. The Cross-Appeal

In its cross-appeal, the government argues that the district court erred by refusing to award an additional $400,000 in restitution to K.L. based on her prostitution in Australia. A person convicted of sex trafficking by force, fraud, or coercion must pay "the full amount of the victim's losses." 18 U.S.C. § 1593(b)(1). The full amount includes "the gross income or value to the defendant of the victim's services or labor," *id.* § 1593(b)(3), including any money that the victim earned while prostituting for the defendant. The government contends that the

23

defendant must repay that money even if the prostitution occurred overseas because, under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, federal courts have "extra-territorial jurisdiction" over sex trafficking by a noncitizen who "is present in the United States." *Id.* § 1596(a)(2).

Baston argues that he does not owe restitution to K.L. for her prostitution in Australia because the jury did not convict him of that conduct, but that argument is baffling. The indictment charged Baston with trafficking K.L. "in . . . Australia," and the jury convicted him of that offense. Plenty of evidence supported its verdict, especially K.L.'s lengthy testimony about how she prostituted for Baston in Australia.

Baston also argues that the restitution statute cannot reach his extraterritorial conduct without exceeding Congress's authority under Article I of the Constitution or violating the Due Process Clause of the Fifth Amendment. Although Baston frames his arguments as challenges to the constitutionality of the restitution statute, his arguments instead challenge the constitutionality of section 1596(a)(2), which confers extraterritorial jurisdiction over sex trafficking by force, fraud, or coercion. If section 1596(a)(2) is constitutional, then the restitution statute is constitutional. *Cf. United States v. Belfast*, 611 F.3d 783, 815 (11th Cir. 2010). We first address

24

Baston's argument under Article I and then address his argument under the Due Process Clause.

1. Section 1596(a)(2) Is a Valid Exercise of Congress's Authority Under Article I of the Constitution.

"The powers of the legislature are defined, and limited," *Marbury v. Madison*, 5 U.S. 137, 176 (1803), and "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution," *United States v. Morrison*, 529 U.S. 598, 607 (2000). The government defends section 1596(a)(2) under the Foreign Commerce Clause, U.S. Const. Art. I, § 8, cl. 3.

Baston argues that Congress cannot enact extraterritorial laws under the Foreign Commerce Clause; it can do so only under the Offences Clause, *id.* cl. 10 (granting Congress the power "[t]o define and punish . . . Offences against the Law of Nations"). Baston also argues that section 1596(a)(2) exceeds the scope of the Foreign Commerce Clause. He is wrong on both accounts.

Congress's power to enact extraterritorial laws is not limited to the Offences Clause. Baston misreads our decision in *United States v. Bellaizac-Hurtado*, 700 F.3d 1245 (11th Cir. 2012), where we held that the Maritime Drug Law Enforcement Act, as applied to extraterritorial drug trafficking, exceeded Congress's authority under the Offences Clause. *Id.* at 1247. We did not hold that the Offences Clause is the *only* power that can support an extraterritorial criminal law; our decision was limited to the Offences Clause because the government

25

failed to offer "any alternative ground upon which the Act could be sustained as constitutional." *Id.* at 1258. If the government had invoked the Foreign Commerce Clause in *Bellaizac-Hurtado*, we might have reached a different result.

Contrary to Baston's argument, this Court has upheld extraterritorial criminal laws under provisions of Article I other than the Offences Clause. *See, e.g.*, *Belfast*, 611 F.3d at 813 (Interstate Commerce Clause). And nothing in the Foreign Commerce Clause limits Congress's authority to enact extraterritorial criminal laws. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813–14 (1993) (Scalia, J., dissenting) ("Congress has broad power under [the Foreign Commerce Clause], and this Court has repeatedly upheld its power to make laws applicable to persons or activities beyond our territorial boundaries where United States interests are affected."); Gary B. Born & Peter B. Rutledge, International Civil Litigation in United States Courts 606 (5th ed. 2011) ("A fairly natural component of [the Foreign Commerce Clause] is the power to regulate conduct that occurs outside of U.S. territory."). In fact, *nothing* in Article I limits Congress's power to enact extraterritorial laws. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *United States v. Baker*, 609 F.2d 134, 136 (5th Cir. 1980). For purposes of Article I, we ask the same question of an extraterritorial law that we ask of any law—that is, whether it falls within one of Congress's enumerated powers.

26

Article I gives Congress the power "[t]o regulate Commerce *with foreign Nations*, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3 (emphasis added). Neither this Court nor the Supreme Court has thoroughly explored the scope of the Foreign Commerce Clause. But many decisions have interpreted its neighbors: the Interstate Commerce Clause and the Indian Commerce Clause. For example, the Supreme Court has cautioned that the Interstate Commerce Clause "must be read carefully to avoid creating a general federal authority akin to the police power." *NFIB v. Sebelius*, 132 S. Ct. 2566, 2578 (2012). The Interstate Commerce Clause permits Congress to enact "three general categories of regulation": Congress can "regulate the channels of interstate commerce"; "regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce"; and "regulate activities that substantially affect interstate commerce," including "purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 16–17. In contrast, the Supreme Court has described the Indian Commerce Clause as a "broad power," *Ramah Navajo Sch. Bd., Inc. v. Bureau of Rev. of N.M.*, 458 U.S. 832, 837 (1982), that grants Congress "plenary" authority over Indian affairs, *Cotton Petrol. Corp. v. New Mexico*, 490 U.S. 163, 192 (1989). "The extensive case law that has developed under the Interstate Commerce Clause," according to the Supreme Court, "is not readily

27

imported to cases involving the Indian Commerce Clause" because the Indian

Commerce Clause does not implicate "the unique role of the States in our

constitutional system." *Id.* One way to approach the Foreign Commerce Clause is

to ask whether it is more like the Interstate Commerce Clause, the Indian

Commerce Clause, or something in between.

What little guidance we have from the Supreme Court establishes that the

Foreign Commerce Clause provides Congress a broad power. The Supreme Court

has described the Foreign Commerce Clause, like the Indian Commerce Clause, as

granting Congress a power that is "plenary," *Bd. of Trustees of Univ. of Ill. v.*

*United States*, 289 U.S. 48, 56 (1933), and "broad," *United States v. Forty-Three*

*Gallons of Whiskey*, 93 U.S. 188, 194 (1876). Also like the Indian Commerce

Clause, the Foreign Commerce Clause does not pose the federalism concerns that

limit the scope of the Interstate Commerce Clause. *See Japan Line, Ltd. v. County*

*of Los Angeles*, 441 U.S. 434, 449 n.13 (1979). *But see United States v. al-Maliki*,

787 F.3d 784, 793 (6th Cir. 2015) ("[A]n unbounded reading of the Foreign

Commerce Clause allows the federal government to intrude on the sovereignty of

other nations—just as a broad reading of the Interstate Commerce Clause allows it

to intrude on the sovereignty of the States."). Indeed, the Supreme Court has

suggested that "the power to regulate commerce . . . when exercised in respect of

foreign commerce may be broader than when exercised as to interstate commerce."

28

*Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 434 (1932); *accord Brolan v. United States*, 236 U.S. 216, 218–19 (1915). "Although the Constitution grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases," the Supreme Court has explained, "there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." *Japan Line*, 441 U.S. at 448 (citation omitted). The Supreme Court has cited James Madison, for example, *id.* at 448 n.12, who described the Foreign Commerce Clause as a "great and essential power" that the Interstate Commerce Clause merely "supplement[s]," The Federalist No. 42, at 283 (Jacob E. Cooke ed., 1961).

We need not demarcate the outer bounds of the Foreign Commerce Clause in this opinion. We can evaluate the constitutionality of section 1596(a)(2) by assuming, for the sake of argument, that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause. In other words, Congress's power under the Foreign Commerce Clause includes at least the power to regulate the "channels" of commerce between the United States and other countries, the "instrumentalities" of commerce between the United States and other countries, and activities that have a "substantial effect" on commerce between the United States and other countries. *Cf. Raich*, 545 U.S. at 16–17; *accord United States v.*

29

*Bollinger*, 798 F.3d 201, 215 (4th Cir. 2015); *United States v. Pendleton*, 658 F.3d 299, 308 (3d Cir. 2011).

Section 1596(a)(2) is constitutional at the least as a regulation of activities that have a "substantial effect" on foreign commerce. Section 1596(a)(2) gives extraterritorial effect to section 1591, the statute that defines the crime of sex trafficking by force, fraud, or coercion. And Congress had a "rational basis" to conclude that such conduct—even when it occurs exclusively overseas—is "part of an economic 'class of activities' that have a substantial effect on . . . commerce" between the United States and other countries. *Cf. Raich*, 545 U.S. at 17, 19. We explained in *Evans* the comprehensive nature of this regulatory scheme:

> Section 1591 was enacted as part of the Trafficking Victims Protection Act of 2000 . . . . [T]he TVPA is part of a comprehensive regulatory scheme. The TVPA criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain. Congress recognized that human trafficking, particularly of women and children in the sex industry, "is a modern form of slavery, and it is the largest manifestation of slavery today." 22 U.S.C. § 7101(b)(1); *see also id.* at § 7101(b)(2), (4), (9), (11). Congress found that trafficking of persons has an aggregate economic impact on interstate and foreign commerce, *id.* § 7101(b)(12), and we cannot say that this finding is irrational.

476 F.3d at 1179 (footnote omitted). Accordingly, section 1596(a)(2) is a constitutional exercise of Congress's authority under the Foreign Commerce Clause.

30

2.  Section 1596(a)(2) Does Not Violate the Due Process Clause.

Baston argues that section 1596(a)(2) violates the Due Process Clause of the Fifth Amendment because he is a noncitizen and his sex trafficking of K.L. occurred exclusively in Australia. The Due Process Clause prohibits the exercise of extraterritorial jurisdiction over a defendant when it would be "arbitrary or fundamentally unfair." *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1378 (11th Cir. 2011) (quoting *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999)). The government responds that, under basic principles of due process and international law, it is fair to hold Baston accountable for trafficking K.L. in Australia. We agree with the government.

To determine whether an exercise of extraterritorial jurisdiction satisfies due process, we have sometimes consulted international law, *see, e.g.*, *id.*; *United States v. Banjoko*, 590 F.3d 1278, 1281 (11th Cir. 2009), but due process requires only that an exercise of extraterritorial jurisdiction not be arbitrary or fundamentally unfair, a question of *domestic* law, *see United States v. Davis*, 905 F.2d 245, 248–49 & n.2 (9th Cir. 1990). Compliance with international law satisfies due process because it puts a defendant "on notice" that he could be subjected to the jurisdiction of the United States. *United States v. Marino-Garcia*, 679 F.2d 1373, 1384 n.19 (11th Cir. 1982); *see also United States v. Tinoco*, 304 F.3d 1088, 1110 n.21 (11th Cir. 2002) (explaining that compliance with

31

international law is "sufficient" to satisfy due process). But compliance with international law is not *necessary* to satisfy due process. *See Hartford Fire*, 509 U.S. at 815 (explaining that Congress "clearly has constitutional authority" to confer extraterritorial jurisdiction in violation of international law if it so chooses); Born & Rutledge, *supra*, at 604 ("If Congress enacts legislation in violation of [the limits of international law on legislative jurisdiction], it is well settled that U.S. courts must disregard international law and apply the domestic statute.").

It is neither arbitrary nor fundamentally unfair to exercise extraterritorial jurisdiction over Baston. The Due Process Clause requires "at least some minimal contact between a State and the regulated subject." *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 221 F.3d 1211, 1216 (11th Cir. 2000) (quoting *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 314 n.2 (1970) (Harlan, J., dissenting)). Baston's contacts with the United States, to borrow the word the government used at oral argument, are "legion." Baston portrayed himself as a citizen of the United States. He resided in Florida, where he rented property, started businesses, and opened bank accounts. *Cf. Allstate Ins. Co. v. Hague*, 449 U.S. 302, 317–18 (1981). He was present at his mother's home in New York when arrested. *Cf. Burnham v. Superior Court of Cal.*, 495 U.S. 604, 610–15 (1990) (plurality opinion). Baston used a Florida driver's license and a United States passport to facilitate his criminal activities. *Cf. Burger King Corp. v. Rudzewicz*,

32

471 U.S. 462, 475–76 (1985). He trafficked K.L. in both the United States and Australia, and when he trafficked her in Australia, he wired the proceeds back to Miami. *Cf. Watson v. Emp'rs Liab. Assur. Corp.*, 348 U.S. 66, 72 (1954). In short, Baston used this country as a home base and took advantage of its laws; he cannot now complain about being subjected to those laws.

Alternatively, exercising extraterritorial jurisdiction over Baston is consistent with international law. The government invokes several principles of international law, but we will discuss only one. Under the "protective principle" of international law, a country can enact extraterritorial criminal laws to punish conduct that "threatens its security as a state or the operation of its governmental functions" and "is generally recognized as a crime under the law of states that have reasonably developed legal systems." Restatement (Second) of Foreign Relations Law § 33(1); *accord United States v. Gonzalez*, 776 F.2d 931, 938–39 (11th Cir. 1985). The citizenship of the defendant is irrelevant. *See United States v. Benitez*, 741 F.2d 1312, 1316 (11th Cir. 1984). And it does not matter whether the conduct had "an actual or intended effect inside the United States"; "[t]he conduct may be forbidden if it has a *potentially* adverse effect." *Gonzalez*, 776 F.2d at 939 (emphasis added). The requirements of the protective principle are satisfied here.

Countries with developed legal systems recognize sex trafficking by force, fraud, or coercion as a crime. As Congress has explained, "The international

33

community has repeatedly condemned slavery and involuntary servitude, violence against women, and other elements of trafficking, through declarations, treaties, and United Nations resolutions and reports." 22 U.S.C. § 7101(b)(23). For example, more than 150 countries, including Australia, have ratified the Palermo Protocol on human trafficking, which requires its participants to establish sex trafficking by force, fraud, or coercion as a criminal offense. *See* Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Arts. 5, 3(a), Nov. 15, 2000, 2237 U.N.T.S. 319, 344–45.

Sex trafficking by force, fraud, or coercion also implicates the national security of the United States. The political branches, who are the experts in these matters, *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010), have identified sex trafficking as a threat to national security. According to Congress, "Trafficking in persons . . . is the fastest growing source of profits for organized criminal enterprises worldwide." 22 U.S.C. § 7101(b)(8). Those criminal enterprises, in turn, destabilize other countries and fund terrorist groups. *See id.*; White House, National Security Presidential Directive/NSPD-22 (Dec. 16, 2002), http://www.combat-trafficking.army.mil/documents/policy/NSPD-22.pdf; National Security Council, *Transnational Organized Crime: A Growing Threat to National and International Security*, https://www.whitehouse.gov/administration/eop/nsc/

34

transnational-crime/threat (all Internet materials as visited Mar. 22, 2016, and available in Clerk of Court's case file). Sex trafficking also risks the spread of communicable diseases, *see* 22 U.S.C. § 7101(b)(11); Arthur Rizer & Sheri R. Glaser, *Breach: The National Security Implications of Human Trafficking*, 17 Widener L. Rev. 69, 89–91 (2011), and supports underground networks that can be used to smuggle drugs, weapons, and terrorists into the United States, *see* Rizer & Glazer, *supra*, at 83–85; Sandra Keefer, *Human Trafficking and the Impact on National Security for the United States*, U.S. Army War College 3–4 (2006). These threats are more than sufficient to invoke the protective principle. *See United States v. Saac*, 632 F.3d 1203, 1211 (11th Cir. 2011).

Congress has the power to require international sex traffickers to pay restitution to their victims even when the sex trafficking occurs exclusively in another country. Baston must pay restitution to K.L. for her prostitution in Australia. The district court erred when it reduced her restitution award.

## IV. CONCLUSION

We **AFFIRM** Baston's judgment of convictions and sentence and **VACATE** the order of restitution and **REMAND** with an instruction to increase the award of restitution for K.L.'s prostitution in Australia.

35