[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 17-12038

———————————————

D.C. Docket No. 4:16-cr-10032-JEM-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ANDRES ALBETO DAVILA-MENDOZA,

Defendant - Appellant.

———————————————

No. 17-12039

———————————————

D.C. Docket No. 4:16-cr-10032-JEM-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

OTMAR SING GONZALEZ,

Defendant - Appellant.

No. 17-12742

D.C. Docket No. 4:16-cr-10032-JEM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JULIO BRAVO PINEDA,

Defendant - Appellant.

Appeals from the United States District Court
for the Southern District of Florida

(August 26, 2020)

Before JILL PRYOR, BRANCH, and BOGGS,* Circuit Judges.

BRANCH, Circuit Judge:

In this case, three foreign nationals in a foreign vessel in the territorial
waters of a foreign nation were arrested by the United States Coast Guard with the
consent of the foreign country and prosecuted in the United States for drug-

---

* Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by
designation.

trafficking crimes under the Maritime Drug Law Enforcement Act (MDLEA), 46 U.S.C. §§ 70501–70508.  The defendants unsuccessfully moved to dismiss the indictment, in relevant part, on the ground that the MDLEA was unconstitutional as applied to them because Congress lacks the authority to criminalize acts committed in the territorial waters of foreign nations.  The defendants ultimately pleaded guilty to the drug-trafficking crimes, but preserved their right to appeal the denial of their motion to dismiss.  This appeal followed and presents us with a question of first impression—whether the MDLEA exceeds Congress's authority pursuant to the Constitution's Foreign Commerce Clause or, alternatively, the Necessary and Proper Clause, as applied to the drug-trafficking activities of these defendants in the territorial waters of a consenting foreign country.  After careful consideration, and with the benefit of oral argument, we conclude that the MDLEA, as applied to these defendants, exceeds Congress's constitutional authority, and we vacate their convictions.

## I.    BACKGROUND

The undisputed facts are as follows.  On June 4, 2016, Andres Davila-Mendoza, Otmar Gonzalez, Julio Pineda, and a minor were on board a stalled go-fast vessel in the territorial waters of Jamaica.  With the permission of the Jamaican government, U.S. Coast Guard officials who had been patrolling the area by air and sea boarded and searched the distressed vessel.  They discovered that the

3

vessel was loaded with 3,500 kilograms of baled marijuana. Pineda told the Coast Guard officials that he was the captain, that he was Nicaraguan, that the vessel was Costa Rican, and that they were traveling from Jamaica to Costa Rica. Another crew member stated that the vessel was overloaded with marijuana and its engines had stopped working. With the further permission of the Jamaican government, the Coast Guard seized the boat occupants and the drugs, and the United States prosecuted the three men.

The three defendants were charged in an indictment with possessing and conspiring to possess with intent to distribute more than 1,000 kilograms of marijuana while on board a vessel, in violation of the MDLEA, 46 U.S.C. §§ 70503(a)(1), 70503(b); 70506(b). That statute provides in relevant part that: "While on board a covered vessel, an individual may not knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 70503(a)(1). This prohibition "applies even though the act is committed outside the territorial jurisdiction of the United States." *Id.* § 70503(b). For purposes of the MDLEA, a "covered vessel" includes "a vessel subject to the jurisdiction of the United States." *Id.* § 70503(e). And the MDLEA specifically provides that a vessel in the territorial waters of a foreign nation is subject to the jurisdiction of the United States "if the nation consents to the enforcement of United States law by the United States." *Id.*

4

§ 70502(c)(1)(E).[1]  Notably, in enacting the MDLEA, Congress found "that . . . trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States."  *Id.* at § 70501.

The defendants moved to dismiss the indictment on the grounds that the application of the MDLEA to them exceeded Congress's power under the Define and Punish Clause, U.S. Const. art. I, § 8, cl. 10.  They also objected to the district court's exercise of *in personam* jurisdiction over them as a violation of their due-process rights.  The government responded that the extraterritorial application of the MDLEA to the defendants was authorized by the Foreign Commerce Clause, *id.* art. I, § 8, cl. 3, and/or the Necessary and Proper Clause, *id.* art. I, § 8, cl. 18.

The magistrate judge heard oral argument on the issue and recommended that the defendants' motion be denied, finding that Congress had lawfully exercised its power under the Foreign Commerce Clause.  The magistrate judge also found that international law provided adequate notice to the defendants, satisfying due process.  The defendants filed objections, and the district court affirmed and adopted the report and recommendation of the magistrate judge.

---

[1] The defendants' boat was a "vessel subject to the jurisdiction of the United States," by statutory definition, because Jamaica consented to the United States Coast Guard's enforcement of American laws in its territorial waters.  46 U.S.C. § 70502(c)(1)(E).

5

The defendants pleaded guilty under a conditional plea agreement that preserved their right to appeal the denial of their motion to dismiss the indictment. The district court sentenced each defendant to 59 months of imprisonment to be followed by removal proceedings and 5 years of non-reporting supervised release. The defendants now appeal on that preserved basis, and we consider their appeals together.

## II.    STANDARD OF REVIEW

"We review *de novo* the legal question of whether a statute is constitutional." *United States v. Campbell*, 743 F.3d 802, 805 (11th Cir. 2014) (quoting *United States v. Tinoco*, 304 F.3d 1088, 1099 (11th Cir. 2002)).

## III.    DISCUSSION

The defendant-appellants in this consolidated appeal argue that the MDLEA, as applied to them, exceeds Congress's authority under Article I of the Constitution. The government contends that the MDLEA, as applied to the defendants, was a valid exercise of Congress's power under the Foreign Commerce Clause, or alternatively, under the Necessary and Proper Clause. We address whether Congress has such authority under each Clause in turn.

### A.    The Foreign Commerce Clause

As an initial matter, the district court correctly recognized that, under our Circuit precedent, the Constitution's Define and Punish Clause does not authorize

6

the MDLEA's operation in foreign territorial waters.  *See United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1258 (11th Cir. 2012).  That tripartite clause grants Congress power to "define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations."  U.S. Const. art. I, § 8, cl. 10.  Because the crimes here were not committed on the high seas,[2] the Piracies and Felonies Clauses do not apply.  And we explained in *Bellaizac-Hurtado* that the use of the term "the law of nations" in the Offenses Clause limits its application to those offenses recognized by customary international law.  700 F.3d at 1249–53.  Because drug trafficking is not such an offense, *id.* at 1253–57, we held that the MDLEA was unconstitutional under the Offenses Clause as applied to the *Bellaizac-Hurtado* defendants, who had been charged with drug trafficking on board a vessel in the territorial waters of Panama.

But we generally presume statutes to be constitutional. *United States v. Morrison*, 529 U.S. 598, 607 (2000).  And our Court has suggested in passing, albeit dicta, that there may exist a different Article I authorization for the MDLEA's operation as applied to conduct that occurs in the territorial waters of a

---

[2] The high seas lie beyond any nation's territorial sea and are "international waters not subject to the dominion of any single nation." *United States v. Louisiana*, 394 U.S. 11, 23 (1969). And we have frequently examined and upheld the constitutionality of the application of the MDLEA to conduct that occurred on the high seas. *See, e.g.*, *United States v. Estupinan*, 453 F.3d 1336, 1338–39 (11th Cir. 2006); *United States v. Rendon*, 354 F.3d 1320, 1322–23 (11th Cir. 2003); *Tinoco*, 304 F.3d at 1092–95.  But this case presents an altogether different question because the conduct at issue here involves foreign nationals aboard a foreign vessel in the territorial waters of a foreign nation, not the high seas.

foreign nation—the Foreign Commerce Clause. *United States v. Baston*, 818 F.3d 651, 667 (11th Cir. 2016) ("If the government had invoked the Foreign Commerce Clause in *Bellaizac-Hurtado*, we might have reached a different result."). The government here has taken us up on that suggestion and argues that the MDLEA as applied to the conduct of these defendants was a valid exercise of Congress's authority pursuant to the Foreign Commerce Clause. Accordingly, the question we must answer is whether the Foreign Commerce Clause authorizes the MDLEA's operation as applied to these defendants.

### 1. Legal Framework

The Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. This tripartite clause is commonly known as the Foreign Commerce Clause, the Interstate Commerce Clause, and the Indian Commerce Clause, respectively. "The Commerce Clause emerged as the Framers' response to the central problem giving rise to the Constitution itself: the absence of any federal commerce power under the Articles of Confederation." *Gonzales v. Raich*, 545 U.S. 1, 16 (2005). The Supreme Court first defined the nature of Congress's commerce power in its 1824 decision in *Gibbons v. Ogden*, explaining that:

> [c]ommerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations,

and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. . . .  It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution.

22 U.S. 1, 189–90, 196 (1824).   Over time, the understanding and meaning of "regulate Commerce," at least in the context of the Interstate Commerce Clause, has expanded and three general categories of regulation have emerged as permissible exercises of Congress's commerce power.  *See Raich*, 545 U.S. at 15–17 (discussing historical evolution of commerce power).  "First, Congress can regulate the channels of interstate commerce.  Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce.  Third, Congress has the power to regulate activities that substantially affect interstate commerce."  *Id.* at 16–17 (internal citations omitted).

With regard to the Foreign Commerce Clause, the Supreme Court has described the Foreign Commerce Clause as granting Congress a broad, "exclusive[,] and plenary" power to regulate commerce with foreign nations.  *See Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 56 (1933).  Yet, jurisprudence addressing Congress's positive Foreign Commerce Clause power is sparse.  Most of the Supreme Court's Foreign Commerce Clause precedents concern the foreign commerce power only in its negative, or dormant, sense.

9

Specifically, the dormant foreign commerce power operates to void acts of the states upon foreign commerce because of the Constitution's overriding concern for national uniformity in foreign commerce—even in instances when Congress has not affirmatively acted. *See, e.g.*, *Japan Line, Ltd. v. Cty. of L.A.*, 441 U.S. 434, 448 (1979) (striking down a state tax on imports); *see also Bd. of Trs. of Univ. of Ill.*, 289 U.S. at 57–58 (affirming a U.S. tariff over a state's protest). But the Supreme Court has never clearly articulated the bounds of the positive foreign commerce power.

And we have only one case in which we have addressed Congress's positive foreign commerce power, *Baston*. Specifically, the defendant in *Baston* was "an international sex trafficker" who trafficked women "around the world, from Florida to Australia to the United Arab Emirates." 818 F.3d at 656. Although Baston was a non-citizen, he was arrested at his mother's home in the United States and charged and convicted of violating 18 U.S.C. §§ 1596(a)(2) and 1591, which prohibits sex trafficking by force, fraud, or coercion.[3] *Id.* at 657–59.

---

[3] 18 U.S.C. § 1591 provides:

> (a) Whoever knowingly--
>> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

10

Notably, § 1596(a)(2) grants the United States "extra-territorial jurisdiction over" sex trafficking by force, fraud, or coercion that occurs overseas by a person who is "present in the United States."[4]

As relevant background, Congress enacted §§ 1591 and 1596, respectively, as part of the Trafficking Victims Protection Act of 2000 and the Trafficking Victims Protection Reauthorization Act of 2008 (together, the "TVPA"). *Id.* at 666, 668. "The TVPA is part of a comprehensive regulatory scheme," *id.* at 668 (quotation omitted), designed to "combat trafficking in persons . . . to ensure just and effective punishment of traffickers, and to protect their victims," 22 U.S.C.

---

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

[4] 18 U.S.C. § 1596(a) provides:

In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section . . . 1591 if—

(1) an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or

(2) an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

§ 7101.  In enacting the TVPA, Congress expressly found that "[t]rafficking in persons is a modern form of slavery," and "is the fastest growing source of profits for organized criminal enterprises worldwide.  Profits from the trafficking industry contribute to the expansion of organized crime in the United States and worldwide."  *Id.* § 7101(b)(1), (8).  Further, Congress found that "[t]rafficking in persons substantially affects interstate and foreign commerce" as such trafficking "has an impact on the nationwide employment network and labor market."  *Id.* § 7101(b)(12).

On appeal, Baston argued that he could not be ordered to pay restitution for his extraterritorial conduct, and that any holding to the contrary would exceed Congress's authority under Article I of the Constitution.  818 F.3d at 666.  Thus, this Court examined whether § 1596(a)(2), which confers extraterritorial jurisdiction over sex trafficking, was a constitutional exercise of Congress's authority under the Foreign Commerce Clause.  *Id.* at  666–69.  In addressing this question, we first noted that "nothing in the Foreign Commerce Clause" or in Article I itself "limits Congress's power to enact extraterritorial laws."  *Id.* at 667.  We then noted that the dormant Foreign Commerce Clause cases provided little insight into the bounds of Congress's positive foreign commerce power other than the suggestion in dicta that the foreign commerce power "may be broader" than the interstate commerce power (the bounds of which have been more thoroughly

12

explored).  *Id.* at 668 (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932)).  Nevertheless, we declined to "demarcate the outer bounds of the Foreign Commerce Clause" and instead "assum[ed], for the sake of argument, that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause."  *Id.*

> In other words, Congress's power under the Foreign Commerce Clause includes at least the power to regulate the "channels" of commerce between the United States and other countries, the "instrumentalities" of commerce between the United States and other countries, and activities that have a "substantial effect" on commerce between the United States and other countries.

*Id.*

We then concluded that § 1596(a)(2) was a valid exercise of Congress's foreign commerce power "at least as a regulation of activities that have a 'substantial effect' on foreign commerce."  818 F.3d at 668.  Citing the congressional findings, we explained that "Congress had a 'rational basis' to conclude that [sex trafficking by force, fraud, or coercion]—even when it occurs exclusively overseas—is 'part of an economic "class of activities" that have a substantial effect on . . . commerce' between the United States and other countries."  *Id.* at 668–69.

With *Baston* as our guide in the case at hand, we too, assume, without deciding, that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause.  Under this assumption, the parties agree that, given the unique

13

facts of this case, if the application of the MDLEA to the defendants' conduct is to pass muster, it will be under the third category of regulated commerce: those activities that have a "substantial effect" on commerce between the United States and foreign nations.

The substantial-effects inquiry is most commonly conducted in the Interstate Commerce Clause context. For instance, in *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court was tasked with determining whether the Gun-Free School Zones Act of 1990, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone[,]" was a valid exercise of Congress's authority under the Interstate Commerce Clause. *Id.* at 551 (citing the Gun-Free School Zones Act of 1990, Pub. L. 101-647, § 1702 (1990), *codified at* 18 U.S.C. § 922(q) (1990)). Emphasizing that Congress's constitutionally enumerated powers have "judicially enforceable outer limits," the Court set out to define more clearly the limit on Congress's authority to regulate interstate commerce. *Id.* at 566. The Court acknowledged that, if the statute "[was] to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce." *Id.* at 559. The Court then explained "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560. But the Gun Free School Zones Act was "a

14

criminal statute that by its terms ha[d] nothing to do with 'commerce' or any sort of economic enterprise[.]" *Id.* at 561. The Court also noted that the statute "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* The Court further explained that although Congress is not required to make findings as to the burdens an activity has on interstate commerce and "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question," it nevertheless would consider any legislative and congressional findings regarding the effect of the activity on interstate commerce as part of its independent inquiry into the constitutionality of the statute under the Commerce Clause. *Id.* at 557 n.2, 562–63 (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 273 (1964) (Black, J., concurring)). However, there were no such findings present in *Lopez* as "[n]either the statute nor its legislative history contain[ed] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." *Id.* at 562 (first alteration in original) (quotations omitted). Finally, although the government made attenuated arguments about the substantial effects of gun possession in a local school zone on interstate commerce (*i.e.*, that possession of a firearm in a school zone might lead to violent crime and violent crime affects the economy by driving

15

up insurance costs and by deterring individuals from traveling to "unsafe areas") the Court rejected those arguments, concluding that such arguments would, logically extended, allow Congress to regulate almost every private activity. *Id.* at 563–64. Consequently, because the text and structure of the Constitution do not allow Congress a "general police power of the sort retained by the States," *id.* at 567, the Court struck down the Act as unconstitutional.

Five years later, in *United States v. Morrison*, 529 U.S. 598 (2000), the Supreme Court was again confronted with the question of whether a particular statute regulating a non-economic activity was a valid exercise of Congress's power under the Interstate Commerce Clause. The statute in question in *Morrison* created a civil right of action against perpetrators of gender-motivated crimes of violence. *Id.* at 601 (citing the Violence Against Women Act of 1994, Pub. L. 103-322, § 40302 (1994), *originally codified at* 42 U.S.C. § 13981 (1994), *now codified at* 34 U.S.C. § 12361). The government sought to sustain the statute "as a regulation of activity that substantially affects interstate commerce." *Id.* at 609. The Court noted that, similar to the statute at issue in *Lopez*, the statute in question did not seek to regulate an economic activity and "contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress'[s] power to regulate interstate commerce." *Id.* at 613. But, unlike in *Lopez*, in

16

*Morrison* Congress made express findings that gender-motivated violence affects interstate commerce

> "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products."

*Id.* at 614–15 (quoting H.R. Conf. Rep. No. 103–711, at 385, U.S. Code Cong. & Admin. News 1994, pp. 1803, 1853).  However, the Court reiterated that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation," and Congress's findings as to the *Morrison* statute suffered from the same flaw as the arguments proffered by the government in *Lopez.*  *Id.* at 614–15.  Specifically, the reasoning of Congress followed "the but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce[,]" which "[i]f accepted . . . would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption."  *Id.* at 615.  And, again the Court cautioned that such reasoning would allow the vast regulation of crime, family law, and other areas traditionally reserved to the states.  *Id.* at 615–16.  Accordingly, the Court concluded that Congress may not "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."  *Id.* at 617.

The Supreme Court applied the substantial-effects test yet again five years later in *Raich* to determine whether the federal Controlled Substances Act ("CSA") was a valid exercise of the interstate commerce clause power as applied to prohibit the purely intrastate growth and use of marijuana for medical purposes in California.  545 U.S. at 15.  The Court explained that although the respondents in *Raich* were cultivating the marijuana for local consumption, it was "a fungible commodity for which there is an established, albeit illegal, interstate market."  *Id.* at 18.  And "a primary purpose of the CSA is to control the supply and demand of controlled substances in both lawful and unlawful drug markets."  *Id.* at 19.  Thus, "[g]iven the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, and concerns about diversion [of the locally grown marijuana] into illicit channels," the Court concluded that Congress had a rational basis for believing that purely intrastate marijuana production would, in the aggregate, have a substantial effect on interstate commerce.  *Id.* at 22 (internal citation omitted).  Accordingly, the Court upheld the constitutionality of the CSA, as applied to the *Raich* respondents, noting that "case law firmly establishes Congress'[s] power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce," and "the *de minimis* character of individual instances" of regulated conduct did not matter.  *Id.* at 17, 22 (quoting *Lopez*, 514 U.S. at 558).

18

Notably, in reaching this conclusion, the Court rejected the respondents' argument that the CSA could not "be constitutionally applied to their activities because Congress did not make a specific finding that the purely local production of marijuana for medicinal purposes "would substantially affect the larger interstate marijuana market." *Id.* at 21. The Court reiterated that "while we will consider congressional findings in our analysis when they are available, the absence of particularized findings does not call into question Congress'[s] authority to legislate." *Id.* Finally, the Court emphasized that a reviewing court's task under the substantial-effects inquiry is "a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* at 22.

### 2. Application of this framework to the facts of this case

With this framework in mind, we turn to the question of whether the MDLEA as applied to the defendants' conduct in this case is a valid exercise of Congress's authority under the Foreign Commerce Clause to regulate those activities that have a "substantial effect" on the commerce of the United States "with foreign nations." U.S. Const. art. I, § 8, cl. 3. The government maintains the *Baston/Raich* framework requires us to conclude that the application of the

19

MDLEA to the wholly foreign conduct in this case was a valid exercise of Congress's authority. *Baston*, however, is factually distinguishable.

First, *Baston* involved statutory provisions enacted as part of the TVPA, "a comprehensive regulatory scheme" that included specific congressional findings "that trafficking of persons has an aggregate economic impact on interstate and foreign commerce." *Baston*, 818 F.3d at 668–69 (quoting *United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007)). Importantly, in applying the substantial-effects test to the extraterritorial conduct at issue in *Baston*, we relied on those congressional findings to determine that "Congress had a 'rational basis' to conclude that such conduct—even when it occurs exclusively overseas—is 'part of an economic "class of activities" that have a substantial effect on . . . commerce' between the United States and other countries." *Id*. at 668 (citing *Raich*, 545 U.S. at 17). Indeed, Congress's findings were the *only* support we cited for this conclusion. *See id.*

Although the government argues that, similar to the TVPA, the MDLEA is a comprehensive regulatory scheme designed to combat a global problem (in this case, drug trafficking), the MDLEA does not contain any congressional findings regarding international drug trafficking's effect on United States commerce "with foreign nations." *See* 46 U.S.C. § 70501. The law mentions only that "trafficking in controlled substances aboard vessels is a serious international problem" and that

20

it "presents a specific threat to the security and societal well-being of the United States[.]" 46 U.S.C. § 70501. It does not include any findings on the existence or extent of an economic impact, aggregate or otherwise, of the international drug trade on United States commerce with foreign nations. *See id.* Admittedly, such congressional findings are not required nor sufficient to establish substantial effect. *Morrison*, 529 U.S. at 614. Nevertheless, "to the extent that congressional findings would enable us to evaluate the legislative judgment that the [wholly foreign drug trafficking] in question substantially affected [the United States's commerce with foreign nations] . . . they are lacking here." *See Lopez*, 514 U.S. at 563.

Second, the statutes at issue in *Baston*, 18 U.S.C. §§ 1591(a) and 1596(a)(2) required both an effect on foreign commerce as an element of the offense and a physical connection to the United States. Specifically, § 1591(a) makes it a crime to, "*in or affecting interstate or foreign commerce*," recruit a person knowing that force, fraud, or coercion "will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a) (emphasis added). The MDLEA does not contain a similar "in or affecting interstate or foreign commerce" element. *See* 46 U.S.C. §§ 70502(c), 70503.

Additionally, and more importantly, although not a focal point of the analysis in *Baston* (but certainly a critical factual distinction when compared to the case at hand), under § 1596(a) the United States has jurisdiction over the

21

extraterritorial sex-trafficking conduct only if the defendant is "a national of the United States," "an alien lawfully admitted for permanent residence," or otherwise "present in the United States, irrespective of the nationality of the alleged offender." *See* 18 U.S.C. § 1596(a).  Thus, § 1596 provides a jurisdictional hook that precludes purely foreign activity with no nexus to the United States from being criminalized.[5]   In contrast, the MDLEA does not contain a similar jurisdictional hook or nexus to tie wholly foreign extraterritorial conduct to the United States.[6] *See* 46 U.S.C. §§ 70502(c), 70503.  In any event, no such jurisdictional hooks are present in this case.

---

[5] This distinction means that had the situation in *Baston* in fact been analogous to the facts of this case—if, for example, the defendant had been an Australian who had trafficked women between Australia and New Zealand, and was never present in the United States—the statutes at issue in *Baston*, 18 U.S.C. §§ 1591 and 1596, would not have permitted the defendant's prosecution in the United States.

[6] Our discussion of nexus in the context of the Foreign Commerce Clause does not in any way undercut our holdings that no nexus is necessary where the MDLEA is an exercise of Congress's express authority to define and punish conduct occurring on the high seas pursuant to the Felonies Clause. *See United States v. Campbell*, 743 F.3d 802, 810 (11th Cir. 2014) ("'[W]e have always upheld extraterritorial convictions [for conduct occurring on the high seas] under our drug trafficking laws as an exercise of power under the Felonies Clause.' . . .  We also have recognized that the conduct proscribed by the [MDLEA] need not have a nexus to the United States because universal and protective principles support its extraterritorial reach" (first alteration in original) (quoting *Bellaizac-Hurtado*, 700 F.3d at 1257)).  Specifically, under the protective principle of international law, Congress "may assert extraterritorial jurisdiction over vessels in the high seas that are engaged in conduct that has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems." *Tinoco*, 304 F.3d at 1108 (quotations omitted).  Thus, we have frequently rejected a nexus requirement and upheld the constitutionality of the application of the MDLEA to conduct that occurred on the high seas as a valid exercise of Congress's authority under the Felonies Clause. *See, e.g.*, *Estupinan*, 453 F.3d at 1338–39; *Rendon*, 354 F.3d at 1325.

22

Furthermore, the facts in *Baston* demonstrated that the defendant's activities were so thoroughly intertwined with the United States's commerce with foreign nations that the issue was not a close call. Baston "resided in Florida, where he rented property, started businesses, and opened bank accounts," and "portrayed himself as a United States citizen." *Baston*, 818 F.3d at 669. He also "used a Florida driver's license and a United States passport to facilitate his criminal activities." *Id.* at 670. He trafficked a victim "in both the United States and Australia, and when he trafficked her in Australia, he wired the proceeds back to Miami." *Id*. The court described Baston's contacts with the United States as "legion," concluding that he "used this country as a home base and took advantage of its laws; he cannot now complain about being subjected to those laws." *Id.* at 669–70. While these facts were discussed in relation to Baston's due-process claim, they nevertheless make clear that Baston could have made no credible argument that his conduct had no effect on United States commerce with foreign nations. In the case at hand, however, the government did not allege that the contraband, the boat, or the defendants had any connection, even a peripheral one, with the United States, when they were seized in the territorial waters of Jamaica. Accordingly, *Baston* is factually distinguishable and is not dispositive of the question of whether the MDLEA as applied to the defendants in this case was a valid exercise of Congress's foreign-commerce power.

23

Turning to *Raich*, the government argues that *Raich* reaffirmed that wholly intrastate economic activities could have a substantial effect on interstate commerce and could be regulated by Congress via the Interstate Commerce Clause.  Therefore, according to the government, if we logically extend *Raich* to this case, the MDLEA's application to the defendants' extraterritorial conduct is a permissible exercise of Congress's authority under the Foreign Commerce Clause because Congress could rationally conclude that foreign drug trafficking could have a substantial effect on the international drug trade, which has an aggregate economic impact on foreign commerce.  However, while *Raich* may serve as a backdrop for our analysis, *Raich* involved Congress's power to regulate commerce "among the states," which undoubtedly presents a different question than Congress's power to regulate commerce "with foreign nations," and, therefore, does not necessarily control our analysis.  In other words, the Interstate Commerce Clause jurisprudence must be carefully adapted to fit the "commerce with foreign nations" context.

To be clear, Supreme Court jurisprudence confirms that Congress's power under the Commerce Clause, be it the Interstate, Foreign, or Indian Commerce Clause, "is subject to outer limits."  *See Lopez*, 514 U.S. at 556–57; *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012) (Congress does not have "a general license to regulate an individual from cradle to grave," even if

24

"[e]veryone will likely participate in the markets for food, clothing, transportation, shelter, or energy"); *Baston*, 818 F.3d at 668 (noting that the Foreign Commerce Clause has "outer bounds" but declining to demarcate those bounds).  Thus, the question in this case, which again presents an as applied challenge, is whether there is a rational basis for concluding that the drug-trafficking conduct here in the territorial waters of a foreign nation, by foreign nationals using a foreign-registered vessel, of drugs not bound for the United States, substantially affects United States commerce with foreign nations.  The record contains no evidence to support this conclusion.  And the government's attenuated argument that wholly foreign drug trafficking impacts the international drug trade, which could impact United States commerce with foreign nations, requires a chain of inferences like that rejected by the *Lopez* court.  *Lopez*, 514 U.S. at 564.  As the *Lopez* court noted, "if we were to accept the [g]overnment's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Id.*

Indeed, under the government's reasoning, nothing would prevent Congress from globally policing wholly foreign drug trafficking commerce, potentially intruding on the sovereignty of other Nations, and bringing foreign nationals into the United States for prosecution based solely on extra-territorial conduct when the United States was neither a party to, nor a target of, the commerce.  *See United States v. Al-Maliki*, 787 F.3d 784, 792–93 (6th Cir. 2015) (cautioning that "an

25

unbounded reading of the Foreign Commerce Clause allows the federal government to intrude on the sovereignty of other nations—just as a broad reading of the Interstate Commerce Clause allows it to intrude on the sovereignty of the States"). Moreover, the Constitution withholds "from Congress a plenary police power that would authorize" such regulation. *Lopez*, 514 U.S. at 566. Rather, the Constitution grants Congress the authority to regulate commerce "with foreign nations" not "among and within foreign nations." *cf. Al-Maliki,* 787 F.3d at 792 (noting that "the textualist reading" of the Foreign Commerce Clause "require[s]" "commerce 'with' a foreign Nation").

Accordingly, for the reasons set forth above, as applied to these defendants, the MDLEA is unconstitutional and exceeded Congress's authority under the Foreign Commerce Clause.

## B. NECESSARY AND PROPER CLAUSE

The government also argues that the MDLEA's application to this case is a valid exercise of Congress's authority pursuant to Article I's Necessary and Proper Clause to enforce the 1989 Convention Against Illicit Traffic Treaty and the 1997 Jamaica Bilateral Agreement between the United States and Jamaica. We are unpersuaded.

Article II of the Constitution gives the President the "Power, by and with the Advice and Consent of the Senate, to make Treaties . . . ." U.S. Const. art. II, § 2,

26

Case: 17-12038    Date Filed: 08/26/2020    Page: 27 of 28

cl. 2.  "In determining whether Congress has the authority to enact legislation implementing such a treaty, we look to the Necessary and Proper Clause."  *United States v. Belfast*, 611 F.3d 783, 804 (11th Cir. 2010).  That clause provides that "Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8, cl. 18.  "Collectively, these clauses empower Congress *to enact* any law that is necessary and proper to effectuate a treaty made pursuant to Article II."  *Belfast*, 611 F.3d at 804 (emphasis added).

But the MDLEA was enacted long before the Convention against Illicit Traffic Treaty or the Jamaica Bilateral Agreement; therefore, it was not *enacted* pursuant to the Necessary and Proper Clause *to effectuate* those international agreements.  *See id.*  And the government has not provided us with any case in which legislation has been upheld as necessary and proper for carrying into execution a treaty which did not yet exist at the time the legislation was enacted.  *Cf. United States v. Lara*, 541 U.S. 193, 201 (2004) ("The treaty power does not literally authorize Congress to act legislatively, for it is an Article II power authorizing the President, not Congress, 'to make Treaties.'" (quoting U.S. Const. art. II, § 2, cl. 2)).  Moreover, "nothing in the legislative history of MDLEA

27

mentions a treaty or intimates that the legislation is in compliance with treaty obligations." *United States v. Cardales-Luna*, 632 F.3d 731, 749 (1st Cir. 2011) (Torruella, J., dissenting). Similarly, "[n]o court decision dealing with [the] MDLEA refers to any treaty obligation as the source of Congress's Article I authority." *Id.* Accordingly, we do not find that, as applied to these defendants, the MDLEA was a valid exercise of Congress's authority under the Necessary and Proper Clause to effectuate the subsequently enacted Illicit Traffic Treaty or the Jamaica Bilateral Agreement.

## IV. CONCLUSION

Because as applied to these defendants, the MDLEA exceeded Congress's authority under Article I, we must **VACATE** their convictions.